Docket No. 102440.

IN THE

SUPREME COURT

OF

THE STATE OF ILLINOIS

---

ANNA MARIE BRUCKER *et al.*, as Parents and Next Friends of
Robert Grant Brucker, a Minor, Appellants, v. JOSEPH M.
MERCOLA, D.O., *et al.*, Appellees.

*Opinion filed December 28, 2007.*

CHIEF JUSTICE THOMAS delivered the judgment of the court,
with opinion.

Justices Freeman, Fitzgerald, and Karmeier concurred in the
judgment and opinion.

Justice Kilbride specially concurred, with opinion.

Justice Burke specially concurred, with opinion.

Justice Garman dissented, with opinion.

**OPINION**

Plaintiffs, Anna Marie Brucker and John Brucker, individually and
as parents and next friends of Robert Grant Brucker, filed a three-
count amended complaint, in the circuit court of Cook County,
against defendants–Dr. Joseph Mercola; his medical practice; and his
employee, Barbara Pierce. The complaint alleged that Anna Brucker,
who was pregnant at the time, went to Dr. Mercola for an allergy
consultation. He prescribed the supplement L-glutamine, but sold her
a bottle marked L-glutamine that his employee, Barbara Pierce, had

mistakenly filled with selenium. The Bruckers alleged that Anna was injured when she ingested a toxic amount of selenium. In count I, Anna sought damages for her own injuries; in count II, John Brucker sought damages for loss of consortium. Count III was brought on behalf of Robert Grant Brucker, a minor, with whom Anna was pregnant when she ingested the selenium. Defendants moved to dismiss count III, arguing that it was barred by the applicable statute of repose. The trial court granted the motion, and the appellate court affirmed (363 Ill. App. 3d 1016). We allowed plaintiffs' petition for leave to appeal. 210 Ill. 2d R. 315. For the reasons that follow, we reverse the dismissal of count III of plaintiffs' amended complaint.

BACKGROUND

On May 2, 1995, Anna went to Dr. Mercola's office for an allergy consultation. Dr. Mercola is a doctor of osteopathic medicine. In his deposition, Dr. Mercola described himself as closer to a nutritionist than an internist or family practitioner. His practice involved using nutrition and nutritional supplements to correct chronic diseases, and he prescribed traditional medicine only sparingly. Dr. Mercola sold many of the supplements that he prescribed for his patients. This was a service that he provided for his patients because insurance usually did not cover the cost of the supplements, and he sold them to his patients for "a lot less" than they could purchase them at health-food stores. Most of the supplements were sold in prepackaged containers, but some were ordered in bulk form and bottled by employees of Dr. Mercola. Initially, L-glutamine was ordered in prepackaged capsule form, but Dr. Mercola's office began ordering it in bulk form in 1995 as a way for patients to save money. At the relevant time, Barbara Pierce, a receptionist with no medical training, was in charge of measuring and bottling the bulk supplements into individual bottles. However, Dr. Mercola testified in his deposition that he took ultimate responsibility for ensuring that the supplement bottles were filled correctly. Dr. Mercola further explained in his deposition that, although he would sell the supplements to a member of the general public who requested them, he was not a general retailer of supplements:

"Q. In terms of the sale of the supplements, what percentage would be your patients as opposed to off-the-street people?

A. Oh, 99.5 percent plus.

Q. Would be your patients?

A. Right. We weren't a retail outlet. Sometimes they would send their friends or relatives for something."

Moreover, Dr. Mercola did not maintain a retail area in his office for the sale of supplements. Rather, they were kept behind the front desk where only office staff had access to them.

Dr. Mercola diagnosed Anna as suffering from a toxic reaction to an overgrowth of candida in her body, so he prescribed L-glutamine, an amino acid, to help repair her colon and intestinal lining. At the time of the diagnosis, his office was out of stock of that particular supplement. He did not, however, advise Anna to purchase it elsewhere. Instead, he sold her what was supposed to be L-glutamine at her next office visit on May 25, 1995. In the meantime, Pierce had accidentally filled some of the L-glutamine bottles with selenium because an unmarked package of selenium had been left in the storage closet where the bulk L-glutamine was typically stored. The selenium was for Dr. Mercola's wife's personal use and was supposed to have been on the file cabinet in Dr. Mercola's office. Dr. Mercola did not know how the selenium ended up in the bulk storage closet. Anna purchased one of these bottles and became violently ill when she went home and took the supplement. The directions for the L-glutamine were to mix a teaspoon of the powder with a glass of water, but this amount was over 20,000 times the safe dosage of selenium.

In 1997, plaintiffs filed a two-count medical malpractice complaint against defendants. This complaint was voluntarily dismissed and refiled in September 2002. On December 22, 2003, plaintiffs amended their complaint to add a third count that alleged that their son Robert, who had been born on January 5, 1996, had been poisoned *in utero* when Anna ingested the selenium powder. Count III alleged that Robert had been injured by the selenium poisoning and contained the following allegations of negligent acts or omissions by defendants:

"(a) Improperly distributing selenium to plaintiff ANNA MARIE BRUCKER,

(b) Failed to maintain proper control measures in the distribution of dietary supplements and prescriptions,

(c) Failed to follow reasonable and necessary precautions to determine that proper dietary supplements were being prescribed and distributed,

(d) Dispensed selenium to plaintiff ANNA MARIE BRUCKER in a toxic dosage,

(e) Failed to utilize proper and adequate measures to insure that proper dietary supplements and prescriptions were being dispensed to patients like ANNA MARIE BRUCKER, and

(f) Were otherwise careless and negligent."

Pursuant to section 2–622 of the Code of Civil Procedure (the Code) (735 ILCS 5/2–622 (West 2006)), an attorney's affidavit and a physician's report were attached to the complaint. Section 2–622 requires this procedure in all cases in which the plaintiff "seeks damages for injuries or death by reason of medical, hospital, or other healing art malpractice." 735 ILCS 5/2–622(a) (West 2006). In the physician's report, a doctor of osteopathic medicine stated that he had reviewed the relevant records and determined to a reasonable degree of medical certainty that the care and treatment provided to Anna by defendants fell below the minimum standard of care and constituted negligence.

Pursuant to section 2–619(a)(5) of the Code (735 ILCS 5/2–619(a)(5) (West 2006)), the defendants moved to dismiss count III as barred by the applicable statute of repose. Defendants relied on section 13–212(b) of the Code (735 ILCS 5/13–212(b) (West 2006)), which provides as follows:

"Except as provided in Section 13–215 of this Act, no action for damages for injury or death against any physician, dentist, registered nurse or hospital duly licensed under the laws of this State, whether based upon tort, or breach of contract, or otherwise, arising out of patient care shall be brought more than 8 years after the date on which occurred the act or omission or occurrence alleged in such action to have been the cause of such injury or death where the person entitled to bring the action was, at the time the cause of action

accrued, under the age of 18 years; provided, however, that in no event may the cause of action be brought after the person's 22nd birthday. If the person was under the age of 18 years when the cause of action accrued and, as a result of this amendatory Act of 1987, the action is either barred or there remains less than 3 years to bring such action, then he or she may bring the action within 3 years of July 20, 1987." 735 ILCS 5/13–212(b) (West 2006).

Defendants noted that the act that had allegedly caused Robert's injuries occurred on May 25, 1995, and count III of plaintiffs' complaint had been filed on December 22, 2003, nearly seven months after expiration of the eight-year repose period.

In their response to the motion to dismiss, plaintiffs made three arguments. First, they argued that the tolling provision of section 13–212(c) applied to their cause of action and thus their complaint was timely filed. Section 13–212(c) provides:

"(c) If the person entitled to bring an action described in this Section is, at the time the cause of action accrued, under a legal disability other than being under the age of 18 years, then the period of limitations does not begin to run until the disability is removed." 735 ILCS 5/13–212(c) (West 2006).

Plaintiffs argued that Robert's status as a fetus at the time of defendants' negligent conduct was a disability apart from minority. According to plaintiffs, the statute of repose did not begin to run until Robert was born and the disability was removed. Second, plaintiffs argued that, in any event, the limitations period of section 13–212(b) did not even apply to their case. According to plaintiffs, their complaint, which alleged, *inter alia*, that defendants "failed to utilize proper and adequate measures to insure that proper dietary supplements and prescriptions were being dispensed to patients like Anna Marie Brucker" and that contained an opinion from a doctor of osteopathy that the care and treatment provided to Anna fell below the minimum standard of care, was *not* alleging an injury "arising out of patient care." Thus, according to plaintiffs, their complaint alleged ordinary negligence and was subject to the limitations periods provided in sections 13–202 (735 ILCS 5/13–202 (West 2006)) and 13–211 (735 ILCS 5/13–211 (West 2006)). Third, plaintiffs

contended that their amended complaint was timely filed because it related back to their original complaint.

The trial court denied defendants' motion to dismiss. Although the court found that the amended complaint did not relate back to the original complaint, the court agreed with plaintiffs' other two arguments. First, the court found that the complaint sounded in ordinary negligence rather than medical malpractice and thus the section 13–212(b) limitations period did not apply. Alternatively, the court found that, if section 13–212(b) did apply, then the repose period was tolled until Robert's birth because his status as a fetus was an additional disability.

Defendants moved to reconsider. On the first issue, defendants pointed out that section 13–212 applies to all injuries "arising out of patient care" and argued that the substance of plaintiffs' complaint unquestionably alleged an injury arising out of patient care. Defendants argued that even if the trial court was correct that the negligence involved was "akin to negligence in keeping a storage cabinet in proper order," the injury still arose out of the care rendered by defendants. Defendants contended that this injury arose out of patient care just as surely as if Dr. Mercola would have accidentally injected Anna with the wrong medication. Defendants offered examples of injuries that Anna could have suffered that would *not* have arisen out of the care provided by defendants:

> "If Mrs. Brucker went to Dr. Mercola's office and while in his office, something fell out of his storage cabinet and hit her on the head, then that would be akin to negligence in keeping a storage cabinet in proper order. Similarly, if Mrs. Brucker was sitting in Dr. Mercola's office and something exploded in his storage cabinet, for whatever reason, and caused injury to Mrs. Brucker, then that would be akin to ordinary negligence. If Mrs. Brucker walked into Dr. Mercola's office and fell on the way to the bathroom because Dr. Mercola or his staff allowed water to accumulate on the floor, that too would be akin to ordinary negligence. In every instance the patient is injured for a reason that is unrelated to the care and treatment being rendered."

On the second issue, defendants argued that being a fetus is not a legal disability and therefore the repose period was never tolled.

Upon reconsideration, the trial court changed its opinion on both issues and granted the motion to dismiss. The court explained that the phrase "arising out of patient care" had been construed broadly and that plaintiffs' claim on behalf of Robert alleged an injury arising out of patient care. Further, the court determined that the repose period of section 13–212(b) had not been tolled. The court found that a claim for prenatal injuries accrues at birth, and that at the time of his birth Robert was not under a disability other than minority. Consequently, section 13–212(c), which tolls the running of the repose period if the plaintiff is under a disability other than minority at the time of accrual, did not apply.

Plaintiffs filed a second amended complaint on February 3, 2005. This complaint specifically alleged Robert's legal disability at the time of Anna's poisoning. Defendants again moved to dismiss count III, relying on their previous arguments. The trial court, relying on the same grounds as it did in dismissing count III of the amended complaint, dismissed count III of the second amended complaint. The trial court found no just reason to delay or enforcement or appeal of the order. See 210 Ill. 2d R. 304(a).

Plaintiffs appealed, and the Appellate Court, First District, affirmed. 363 Ill. App. 3d 1016. The appellate court rejected plaintiffs' contention that their complaint sounded in ordinary negligence and was not subject to section 13–212(b)'s limitations period. The court noted that the phrase "arising out of patient care" in section 13–212 had been construed broadly. Although it agreed with plaintiffs that defendants' negligence involved the improper storage and packaging of nonprescription supplements, the court explained that "the fact remains that the damages suffered by Robert arose from Dr. Mercola's care and treatment of his patient, Mrs. Brucker. The pertinent issue is not whether plaintiffs' suit alleged medical malpractice, but whether the alleged injuries arose out of patient care." 363 Ill. App. 3d at 1021. The court further rejected plaintiffs' argument that the injury arose out of Dr. Mercola's business as a vendor of supplements, pointing out that this case did not involve a member of the general public who simply came in off the street to purchase supplements from Dr. Mercola. Rather, Anna was Dr. Mercola's patient and he prescribed the supplement to treat a medical

condition but then sold her a mislabeled bottle. 363 Ill. App. 3d at 1023.

The appellate court also agreed with defendants that section 13–212(c)'s tolling provision did not apply. The appellate court held that it did not need to determine whether Robert's status as a fetus at the time the injury occurred was a disability because the relevant time to assess whether Robert was under a disability other than minority was not at the time the injury *occurred* but at the time the cause of action *accrued*. 363 Ill. App. 3d at 1025. The court held that a cause of action for prenatal injuries accrues at birth, and Robert was not under a disability other than minority when the cause of action accrued. 363 Ill. App. 3d at 1025-26. Thus, the repose period ended eight years after the injury occurred, and count III of plaintiffs' complaint was filed too late.

We allowed plaintiffs' petition for leave to appeal. 210 Ill. 2d R. 315.

ANALYSIS

The trial court dismissed count III of plaintiffs' second amended complaint pursuant to section 2–619(a)(5) of the Code, which provides for the involuntary dismissal of a cause or claim when the action is not "commenced within the time limited by law." 735 ILCS 5/2–619(a)(5) (West 2006). We review such dismissals *de novo*. *DeLuna v. Burciaga*, 223 Ill. 2d 49, 59 (2006).

To determine whether count III of plaintiffs' amended complaint was properly dismissed, we first must determine whether count III is a claim subject to the statute of repose set forth in section 13–212(b) and, if it is, whether the tolling provision found in section 13–212(c) applies. These issues require us to construe those statutory provisions.

The principles informing statutory construction are familiar. The primary rule of statutory construction is to ascertain and give effect to the legislature's true intent and meaning. *Vine Street Clinic v. HealthLink, Inc.*, 222 Ill. 2d 276, 282 (2006). The language of the statute is the best indication of legislative intent, and our inquiry appropriately begins with the words used by the legislature. *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n*, 146 Ill. 2d 175, 207 (1991). If the statutory language is

clear and unambiguous, then there is no need to resort to other aids of construction. *Henry v. St. John's Hospital*, 138 Ill. 2d 533, 541 (1990). However, when the language used is susceptible to more than one equally reasonable interpretation, the court may look to additional sources to determine the legislature's intent. *People ex rel. Department of Professional Regulation v. Manos*, 202 Ill. 2d 563, 571 (2002). All provisions of a statutory enactment are viewed as a whole. *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 279 (2003). Accordingly, all words and phrases must be interpreted in light of other relevant provisions of the statute and must not be construed in isolation. *Cryns*, 203 Ill. 2d at 279-80. Each word, clause and sentence of the statute, if possible, must be given reasonable meaning and not rendered superfluous. *Sylvester v. Industrial Comm'n*, 197 Ill. 2d 225, 232 (2001). In determining the General Assembly's intent, we may properly consider not only the language of the statute, but also the purpose and necessity for the law, the evils sought to be remedied, and the goals to be achieved. *Cryns*, 203 Ill. 2d at 280. Further, when undertaking the interpretation of a statute, we must presume that when the legislature enacted a law, it did not intend to produce absurd, inconvenient or unjust results. *Vine Street Clinic*, 222 Ill. 2d at 282. Finally, in construing statutory provisions like the one at issue here, we must keep in mind both that (1) the purpose of tolling provisions for legal disability is to protect the rights of those persons who are not competent to do so themselves, and (2) "it has long been the public policy of this state that courts should carefully guard the rights of minors and that a minor should not be precluded from enforcing his or her rights unless clearly barred from doing so." *Bruso v. Alexian Brothers Hospital*, 178 Ill. 2d 445, 454-55 (1997).

## Arising Out of Patient Care

The limitations periods provided in section 13–212 apply to any actions "whether based upon tort, or breach of contract, or otherwise, arising out of patient care." 735 ILCS 5/13–212(a), (b) (West 2006). In *Hayes v. Mercy Hospital & Medical Center*, 136 Ill. 2d 450 (1990), this court explained the purpose behind the General Assembly's enactment of section 13–212 and held that, in light of that purpose, when a cause of action is filed against a physician or other covered medical provider, the legal theory upon which the plaintiff

styles his or her claim will not govern whether section 13–212 applies. This court said:

> "As previously discussed by this court (see, *e.g.*, *Anderson v. Wagner* (1979), 79 Ill. 2d 295), when the General Assembly limited the time period in which a party could bring a suit for medical malpractice, it was faced with what it perceived as a medical malpractice insurance crisis. 'The crisis resulted from the increasing reluctance of insurance companies to write medical malpractice insurance policies and the dramatic rise in premiums demanded by those companies which continued to issue policies. The difficulty in obtaining insurance at reasonable rates forced many health-care providers to curtail or cease to render their services. The legislative response to this crisis sought to reduce the cost of medical malpractice insurance and to insure its continued availability to the providers of health care.' (*Anderson*, 79 Ill. 2d at 301.) The legislature therefore enacted, among other provisions, an outside time limit of five years, later amended to four, in which an action could be brought against physicians and hospitals for actions arising out of patient care (Pub. Act 79–960, eff. Nov. 11, 1975; Ill. Rev. Stat. 1975, ch. 83, par. 22.1). (*Mega v. Holy Cross Hospital* (1986), 111 Ill. 2d 416, 427.) This definite period in which an action could be filed was viewed as necessary to prevent extended exposure of physicians and other hospital personnel to potential liability for their care and treatment of patients, thereby increasing an insurance company's ability to predict future liabilities. (See *Anderson*, 79 Ill. 2d at 307.) This increased ability to predict liability was meant to assist in reducing health-care malpractice insurance premiums." *Hayes*, 136 Ill. 2d at 457-58.

This court then concluded that the legislature's objective would be advanced only if the statute was read in such a way that it "limit[ed] a physician's exposure to liability for damages for injury or death arising out of patient care under all theories of liability." *Hayes*, 136 Ill. 2d at 459. Thus, *Hayes* makes clear that the relevant question in determining whether section 13–212 provides the applicable limitations period is not whether the complaint alleges medical

-10-

malpractice, but whether the complaint alleges an injury arising out of patient care.

Before reaching that question, we must clarify what is not at issue. Both plaintiffs and defendants spend a significant portion of their arguments discussing wholly inapplicable authority. The courts in *Mooney v. Graham Hospital Ass'n*, 160 Ill. App. 3d 376 (1987), and *Lyon v. Hasbro Industries, Inc.*, 156 Ill. App. 3d 649 (1987), did not consider the applicability of section 13–212 or the meaning of "arising out of patient care." Rather, the court in each case addressed whether the plaintiff's complaint had to be dismissed because the plaintiff failed to attach an attorney's affidavit and a health professional's report pursuant to section 2–622 of the Code of Civil Procedure (735 ILCS 5/2–622 (West 2006)). Here, there is no section 2–622 issue because plaintiffs attached an attorney's affidavit and a health professional's report. In the health professional's report, a doctor of osteopathic medicine stated that he had reviewed the records and determined to a reasonable degree of medical certainty that the treatment provided to Anna Marie Brucker fell below the minimum standard of care.

Moreover, the scope of each of these statutes is different. Section 13–212(b), which is a limitations section, applies to actions for damages "for injury or death against any physician, dentist, registered nurse or hospital duly licensed under the laws of this State, whether based upon tort, or breach of contract, or otherwise, *arising out of patient care*." (Emphasis added.) 735 ILCS 5/13–212(b) (West 2006). By contrast, section 2–622, which governs when an attorney's affidavit and a health professional's report are required, applies to "any action, whether in tort, contract or otherwise, in which the plaintiff seeks damages for injuries or death *by reason of medical, hospital, or other healing art malpractice*." (Emphasis added.) 735 ILCS 5/2–622(a) (West 2006). Section 13–212(b) is broader than section 2–622(a), and it is clear that there are some situations in which a plaintiff would have to file within the time limits prescribed by section 13–212(b), but would not have to attach an attorney's affidavit or a health professional's report. All actions for injury or death arising out of patient care must be filed within the time limits set forth in section 13–212, but only those that allege injuries by reason of healing art malpractice require an attorney's affidavit and a health professional's report to be attached to the complaint. In deciding

-11-

whether section 2–622 affidavits and medical reports are required in particular cases, courts have focused on the plain meaning of the terms "healing," "art," "healing art" and "malpractice." See, *e.g.*, *Jackson v. Chicago Classic Janitorial & Cleaning Service, Inc.*, 355 Ill. App. 3d 906, 910 (2005); *Milos v. Hall*, 325 Ill. App. 3d 180, 183 (2001); *Cohen v. Smith*, 269 Ill. App. 3d 1087, 1090 (1995); *Lyon*, 156 Ill. App. 3d at 653. Consideration of the definitions of these terms has led courts to focus on three factors in determining the applicability of section 2–622: (1) whether the standard of care involves procedures not within the grasp of the ordinary lay juror; (2) whether the activity is inherently one of medical judgment; and (3) the type of evidence that will be necessary to establish plaintiff's case. See *Jackson*, 355 Ill. App. 3d at 909. This is *not* the analysis courts have used in determining the applicability of section 13–212. Because the terms "healing art" and "malpractice" appear nowhere in section 13–212,[1] an analysis based on the definitions of those terms is not helpful.[2] Thus, we will not consider the portions of the parties' arguments that are based on section 2–622 cases.

Not surprisingly, courts that have considered the scope of section 13–212 have focused on the plain meaning of "arising out of patient care." In *Miller v. Tobin*, 186 Ill. App. 3d 175 (1989), the appellate court, consulting 6 C.J.S. *Arise* 525, 526 (1975), concluded that the phrase "arising out of" is "broad and generally means 'originating from,' 'growing out of,' or 'flowing from.'" *Miller*, 186 Ill. App. 3d at 177. Accordingly, the court held the statute applicable to a claim alleging that a psychiatrist violated the Mental Health and Developmental Disabilities Confidentiality Act (Ill. Rev. Stat. 1987, ch. 91½ , pars. 801 through 817 (now 740 ILCS 110/1 *et seq.* (West 2006))) by revealing confidential information to the plaintiff's wife after the plaintiff had asked the doctor not to reveal the information. The court found that the alleged injury arose out of patient care

---

[1]Although courts informally refer to section 13–212 as the "medical malpractice statute of repose" (see *Hayes*, 136 Ill. 2d at 453), the term "medical malpractice" does not appear in that section.

[2]As we will discuss later, a similar error underlies and informs much of Justice Burke's special concurrence.

because the plaintiff and his wife had seen the doctor for medical problems and the information was disclosed during his wife's phase of the treatment. The *Miller* court noted that "[w]hile this section [13–212] applies to malpractice actions against physicians, it is a general limitations section designed to apply to *all* cases against physicians arising out of patient care. Therefore, *the pertinent issue is not whether plaintiff's suit alleges malpractice, but whether plaintiff's injuries arose out of patient care*." (Emphases added.) *Miller*, 186 Ill. App. 3d at 177.

In *Walsh v. Barry-Harlem Corp.*, 272 Ill. App. 3d 418 (1995), the court held section 13–212 applicable to a Consumer Fraud and Deceptive Business Practices Act (Ill. Rev. Stat. 1989, ch. 121½, par. 261 *et seq.* (now 815 ILCS 505/1 *et seq.* (West 2006))) claim filed against an eye clinic. The plaintiff alleged in his consumer fraud claim that the doctor intentionally misrepresented that plaintiff needed to have a cataract removed and a new lens implanted. The plaintiff alleged that he did not in fact need these services. The plaintiff argued that section 13–212 was not applicable to his complaint because he was not alleging an injury that resulted from the manner in which patient care and treatment were rendered. Rather, his complaint was about the commercial aspects of the business and the fact that the defendants intentionally misrepresented test results and the need for surgery. He did not allege any deviation from a medical standard of care. The court rejected his argument, finding that his injury did arise out of patient care. The court held that "the plaintiff's allegations of misconduct were inextricable from the defendants' diagnosis and treatment of his eyes." *Walsh*, 272 Ill. App. 3d at 425.

In *Stiffler v. Lutheran Hospital*, 965 F.2d 137 (7th Cir. 1992), the Seventh Circuit noted the broad reach of section 13–212. In that case, the plaintiff brought a products liability action against Lutheran Hospital. Several years after the plaintiff had a prosthetic device implanted in her chest during a hernia operation, the device broke free and became entangled in her intestines. The plaintiff's products liability suit alleged that the hospital was strictly liable as the prosthetic device's distributor. The hospital argued that the suit was barred by section 13–212. The plaintiff contended, *inter alia*, that section 13–212 did not apply to her claim because she was not alleging an injury arising out of patient care. According to the plaintiff,

her injury resulted not from the hospital's medical care, but rather from its negligent choice and distribution of a defective prosthetic device. The Seventh Circuit rejected this argument, noting that "arising out of patient care" was intended to be construed broadly and that there was not a clear distinction between medical care and the distribution of medical materials. *Stiffler*, 965 F.2d at 140-41. Moreover, the court found that "medical materials are so inextricably linked with every step of today's treatment processes that their use almost *per se* arises 'out of patient care.' " *Stiffler*, 965 F.2d at 140.

Finally, in *Cammon v. West Suburban Hospital Medical Center*, 301 Ill. App. 3d 939 (1998), the plaintiff, as administrator of the estate of her deceased husband, filed suit against West Suburban Hospital after her husband died of cardiopulmonary arrest shortly after undergoing surgery. The plaintiff's amended complaint contained several counts seeking recovery for medical malpractice. In count V, however, the plaintiff sought damages based on the hospital's alleged spoliation of evidence. In this count, the plaintiff alleged that the hospital was negligent because it breached its duty to preserve the operative report for the exploratory laparotomy that caused her husband's death, prejudicing her malpractice claims against the hospital and the doctor who performed the surgery. The trial court dismissed count V as time-barred under the four-year repose provision of section 13–212(a) of the Code (735 ILCS 5/13–212(a) (West 1996)). *Cammon*, 301 Ill. App. 3d at 942-43.

The appellate court reversed. The court first acknowledged that, in a section 13–212 analysis, the relevant question is whether the complaint alleges an injury arising out of patient care. The court then agreed with *Miller* that, " 'The phrase "arising out of" is broad and generally means "originating from," "growing out of," or "flowing from." ' " *Cammon*, 301 Ill. App. 3d at 950, quoting *Miller*, 186 Ill. App. 3d at 177. Instead of next considering whether the allegations of the plaintiff's complaint alleged an injury that originated from, grew out of, or flowed from her husband's care and treatment, however, the court shifted gears and considered what breach of duty plaintiff was alleging:

> "The breach of duty necessary to support a medical negligence action is the defendant's deviation from the proper medical standard of patient care. *Borowski v. Von Solbrig*, 60

Ill. 2d 418, 423, 328 N.E.2d 301 (1975). The damages suffered in such an action arise out of inappropriate patient care. By contrast, a negligence action for spoliation of evidence is predicated upon a breach of duty to preserve evidence. *Boyd v. Travelers Insurance Co.*, 166 Ill. 2d 188, 195, 652 N.E.2d 267 (1995). Although the plaintiff in an action alleging the negligent destruction of evidence resulting in an inability to prove a cause of action for medical negligence must prove the merits of the underlying medical negligence claim (see *Boyd*, 166 Ill. 2d at 197-98), the fact remains that the damages suffered by the plaintiff in such a case arise from the defendant's destruction of evidence, not the breach of a medical standard of patient care." *Cammon*, 301 Ill. App. 3d at 950.

Regardless of whether *Cammon*'s duty analysis was appropriate, however, its conclusion was unquestionably correct. Destroying her husband's operative report after the fact was not part of the care and treatment that the doctor and hospital provided to the plaintiff's husband. The injury that the plaintiff suffered was to her ability to prove her lawsuit, and that injury did not arise out of patient care.

Because the applicability of section 13–212 turns on whether the plaintiff alleged an injury "arising out of patient care," the courts that focused on the plain meaning of that phrase used the correct analysis. The phrase "arising out of" has a set meaning in the law. In any context in which it is used, the phrase has been defined broadly and refers to a causal connection. *Miller*'s definition of "arising out of" as "generally mean[ing] 'originating from,' 'growing out of,' or 'flowing from' " (*Miller*, 186 Ill. App. 3d at 177) is consistent with definitions found in other authorities. Black's defines "arise" as "[t]o originate; to stem (from)" or "[t]o result (from)." Black's Law Dictionary 115 (8th ed. 2004). Webster's defines "arise" as "to originate from a specified source." Webster's Third New International Dictionary 117 (1993).

The phrase "arising out of" is construed most often in workers' compensation proceedings. The Workers' Compensation Act (820 ILCS 305/1 *et seq.* (West 2006)) provides compensation for injuries "arising out of and in the course of" employment. 820 ILCS 305/2

(West 2006). This court has placed the following construction on "arising out of":

> "The 'arising out of' component is primarily concerned with causal connection. To satisfy this requirement it must be shown that the injury had its origin in some risk connected with, or incidental to, the employment so as to create a causal connection between the employment and the accidental injury. *Caterpillar Tractor Co. v. Industrial Comm'n*, 129 Ill. 2d 52, 58 (1989). Stated otherwise, 'an injury arises out of one's employment if, at the time of the occurrence, the employee was performing acts he was instructed to perform by his employer, acts which he had a common law or statutory duty to perform, or acts which the employee might reasonably be expected to perform incident to his assigned duties. [Citations.] A risk is incidental to the employment where it belongs to or is connected with what an employee has to do in fulfilling his duties.' *Caterpillar Tractor Co. v. Industrial Comm'n*, 129 Ill. 2d at 58." *Sisbro, Inc. v. Industrial Comm'n*, 207 Ill. 2d 193, 203-04 (2003).

The phrase does not encompass "but for" causation in the Workers' Compensation Act in that it is not enough merely to show that the claimant would not have been at the place where the injury occurred but for his or her employment. *Antoskiewicz v. Industrial Comm'n*, 382 Ill. 149, 154 (1943); see *Johnson v. Industrial Comm'n*, 278 Ill. App. 3d 59, 62 (1996). It is also not sufficient to show that the accident would not have occurred but for the fact that the claimant's employment placed the claimant in a position in which he was injured by a neutral (neither personal nor related to employment) force. See *USF Holland, Inc. v. Industrial Comm'n*, 357 Ill. App. 3d 798, 803 (2005).

In other contexts, however, courts have linked "arising out of" with "but for" causation. When a statute not only uses the phrase "arising out of" but also includes the phrases "relating to" and "in connection with," such as in section 5–227 of the Pension Code (40 ILCS 5/5–227 (West 2006)), which provides that a police officer may be disqualified from receiving benefits if he is convicted of a felony "relating to or arising out of or in connection with" his service as a police officer, this court has found that the statute is broad enough to

encompass "but for" causation. *Devoney v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 199 Ill. 2d 414, 423 (2002). When construing an insurance policy, courts have also defined "arising out of" as referring to "but for" causation, but that is because the phrase is considered broad and vague and insurance policies must be construed in the insured's favor. See *State Automobile Mutual Insurance Co. v. Kingsport Development, LLC*, 364 Ill. App. 3d 946, 953-54 (2006); *Liberty Mutual Insurance Co. v. Westfield Insurance Co.*, 301 Ill. App. 3d 49, 54 (1998).

Considering the above authorities, we construe "arising out of patient care" simply as requiring a causal connection between the patient's medical care and the injury. While the phrase does not need to be construed so broadly as to encompass "but for" causation, it clearly covers any injuries that have their origin in, or are incidental to, a patient's medical care and treatment.[3] This court has been defining "arising out of" as referring to cause or origin since at least 1917 (see *Eugene Dietzen Co. v. Industrial Board*, 279 Ill. 11, 15 (1917)), so we should presume that the legislature was well aware of the judicial construction of this phrase when it used it in section 13–212.[4] Moreover, it is obvious that the term "patient care" is itself broad,

---

[3]Examples of the types of injuries that would not have happened "but for" the fact that Anna went to Dr. Mercola's office for treatment were given in defendants' motion to dismiss: something falls out of Dr. Mercola's storage cabinet and hits Anna on the head, something explodes in the storage cabinet and injures her, or Anna slips and falls on the way to the bathroom in Dr. Mercola's office. These hypothetical injuries would not have happened but for the fact that Anna went to Dr. Mercola's office for treatment, but they would not have been injuries arising out of the care and treatment provided to Anna by defendants.

[4]The specially concurring justices offer no explanation for why we should not presume that the legislature intended "arising out of" to have the same meaning always assigned to it. Morever, in the workers' compensation context, this court has for years been construing the phrase to refer to cause or origin while not encompassing "but for" causation, so the specially concurring justices' assertions that this is an unworkable test are not well-taken.

encompassing the entire scope of a person's medical care and treatment.

Here, there is no question that plaintiffs' complaint alleged an injury arising out of patient care. The complaint alleged that Anna was Dr. Mercola's patient and that Dr. Mercola prescribed L-glutamine for Anna but dispensed selenium to her instead. The complaint further alleged that Anna and her fetus, Robert, were poisoned when she ingested the selenium. Anna's and Robert's injuries were caused by the care and treatment provided to Anna by defendants. Moreover, it would be preposterous to argue that this was simply a case of "but for" causation. Anna was not injured by some neutral force that had nothing to do with the care and treatment defendants provided to her. Rather, her injury was caused because she ingested the substance in the bottle that Dr. Mercola sold to her to treat a medical condition that Dr. Mercola had diagnosed.

The cases discussed earlier also support the conclusion that Robert's alleged injuries arose out of patient care. The courts in these cases noted that section 13–212 was intended to be broad. *Miller* found that an injury arose out of patient care when it grew out of or flowed from the plaintiff's and his wife's treatment. *Walsh* found that the allegations of misconduct were inextricable from the defendants' diagnosis and treatment of the plaintiff. *Stiffler* found that the use of medical materials are so inextricably linked to patient care that their use almost *per se* arises out of patient care. All of these conclusions are equally true here, where Dr. Mercola used supplements to treat his patients, bottled them in his office so that his patients could get them at a lower price, recommended one to treat plaintiff, but then sold her a mispackaged bottle. Moreover, this situation is obviously unlike *Cammon*, where the destruction of medical records was unrelated to the provision of medical care and treatment.

Plaintiffs attempt to get around the seemingly inescapable conclusion that their complaint alleged an injury arising out of patient care by arguing that Dr. Mercola "wore two hats": he was both a doctor of osteopathic medicine and a retail vendor of supplements. Plaintiffs argue that the negligence alleged here arose solely out of the latter. The Seventh Circuit in *Stiffler*, when setting forth a hypothetical example of the type of injury that would not arise out of patient care, outlined a scenario in which a medical provider wore two

such hats. After noting how broad the term "arising out of patient care" was intended to be, the Seventh Circuit conceded that there may be some activities undertaken by a hospital that are not part of a patient's medical treatment. The example the Seventh Circuit came up with was the following:

> "For example, a hospital-run gift shop which sells non-prescription medicine to the general public might be held strictly liable if the product ultimately proved harmful for consumer use. But that is not this case." *Stiffler*, 965 F.2d at 141.

Nor is it this case.

The *Stiffler* hypothetical is notable in that, in order to come up with an example of an injury that did not arise out of patient care, the Seventh Circuit was forced to use an example in which there was *no patient*. According to the Seventh Circuit, an injury would not arise out of patient care if a hospital *gift shop* stocked nonprescription medicine, a *consumer* bought that medication at the gift shop, and it was later determined that this type of medication was not safe for consumer use. Of course, that is not at all what was alleged here. In this case, the plaintiff alleged that she and her fetus were poisoned and that this poisoning occurred because she saw Dr. Mercola for medical treatment, he prescribed L-glutamine for her, and then he sold her a bottle marked "L-glutamine" that an employee in his office had mistakenly filled with selenium. Unlike the gift-shop consumer in the *Stiffler* hypothetical, plaintiffs in this case alleged an injury arising out of patient care.

Moreover, the record clearly refutes plaintiffs' claim that Dr. Mercola wore the hats of both a doctor of osteopathic medicine and a retail vendor of supplements. Although Dr. Mercola would sell supplements to a member of the general public who requested them, that happened very rarely. When asked about this in his deposition, Dr. Mercola explained that his office was not a retail outlet for supplements. Although his patients would occasionally send their friends or relatives in to buy supplements, "99.5 percent plus" of sales were to his patients. Thus, the only evidence in the record on this issue shows that, although Dr. Mercola would sell his supplements to a member of the general public who requested them, this was a service that he provided for his patients. He did not hold himself out as a

retailer of supplements and did not maintain a retail area in his office for the sale of supplements. Moreover, it was not one of these members of the general public who was injured in this case; it was plaintiff Anna Brucker, a patient for whom Dr. Mercola prescribed the supplement to treat a medical condition but then sold a mislabeled bottle. The appellate court had it exactly right when it concluded:

> "Perhaps defendants would be liable under ordinary negligence if they had injured a member of the general public by promoting and selling supplements in mislabeled bottles. But that is not this case. Dr. Mercola examined Mrs. Brucker and treated her allergy by recommending, *inter alia*, L-glutamine. After Dr. Brucker replenished his supply of L-glutamine, Mrs. Brucker returned to his office and purchased the mislabeled bottle. The medical malpractice repose provision applies to count III of plaintiffs' amended complaint because count III alleged an injury that arose out of patient care." 363 Ill. App. 3d at 1023.

In their special concurrences, Justices Kilbride and Burke find it especially relevant that nonpatients could, and sometimes did, purchase supplements from Dr. Mercola. Slip op. at 44-45 (Kilbride, J., specially concurring); slip op. at 55 (Burke, J., specially concurring). The question the concurring justices must consider, however, is whether it would change their view if Dr. Mercola had testified that he would *not* sell his supplements to a member of the general public who requested him. If that fact would not change the concurring justices' position, then the point is irrelevant and need not be discussed. If it would, then it is incumbent on the concurring justices to explain how Dr. Mercola's relationship with a third party could possibly change the nature of his relationship with his patient, Anna Brucker.

Plaintiffs' only other argument on this point is a brief four-sentence argument that section 13–212 does not apply because Barbara Pierce, the employee who filled the L-glutamine bottle with the wrong substance, was an office receptionist, not a licensed health-care provider. Section 13–212 applies to "any physician, dentist, registered nurse or hospital duly licensed under the laws of this State." 735 ILCS 5/13–212 (West 2006). This court noted in *Solich v. George & Anna Portes Cancer Prevention Center of Chicago, Inc.*,

-20-

158 Ill. 2d 76, 82 (1994), however, that section 13–212 also covers, in certain circumstances, employees of licensed providers acting within the scope of their employment. Plaintiffs have offered no reasons why this case–in which they sued Pierce as Dr. Mercola's agent, Dr. Mercola placed Pierce in charge of filing the supplement bottles, Pierce filled the bottles in the scope of her employment, and Dr. Mercola testified that it was his responsibility to see that the supplement bottles were filled correctly–would not represent one of those circumstances.

Before leaving this issue, we would be remiss if we did not address the special concurrences filed by Justices Kilbride and Burke. Although both justices incorrectly argue that the majority adopts "but for" causation (seemingly finding it easier to refute what the opinion expressly disavows than what it adopts), the substance of their positions is different. Justice Kilbride agrees with the majority that the appropriate test to determine the applicability of section 13–212 is whether the complaint alleged an injury "arising out of patient care," but concludes that the majority has ignored the "patient care" component and applied the statute to an injury wholly unrelated to patient care. By contrast, Justice Burke argues that the court should ignore the legislature's pronouncement that the statute applies to injuries arising out of patient care and instead construe the statute to mean that it applies to injuries arising out of medical negligence. Both points are easily refuted.

We address Justice Kilbride's concurrence first. Justice Kilbride argues that the majority has considered only the "arising out of" component of "arising out of patient care" while ignoring the "patient care" component. Thus, Justice Kilbride contends that we have improperly applied section 13–212 to a situation having nothing to do with patient care. Indeed, Justice Kilbride makes the following representations in his special concurrence: (1) "the injury alleged was not based on improper or negligent patient care" (slip op. at 42 (Kilbride, J., specially concurring)); (2) the legislature did not intend to "shield medical providers from liability in all endeavors, including those not associated with patient care"(slip op. at 44 (Kilbride, J., specially concurring)); (3) the filling of the supplement containers was an activity solely supporting Dr. Mercola's sale of supplements not his medical practice (slip op. at 44 (Kilbride, J., specially concurring)); (4)

-21-

the sale of supplements was "completely unrelated" to Dr. Mercola's care and treatment of his patients (slip op. at 46 (Kilbride, J., specially concurring)); (5) the legislature did not intend section 13–212 "to eliminate medical providers' liability in causes of action unrelated to the 'care and treatment of patients' "[5] (slip op. at 47 (Kilbride, J., specially concurring)).

To reiterate: Dr. Mercola is an osteopath who uses nutritional supplements to treat his patients. As a service to his patients, he stocks the supplements he prescribes in his office so that his patients can have easy access to them and obtain them at a lower price than they could elsewhere. As an additional cost-saving measure, he purchased some of the supplements in bulk form and bottled them in his office. He delegated the task of bottling supplements to a staff person with no medical training. He diagnosed his patient Anna Brucker as having a condition requiring treatment with L-glutamine, one of the supplements that he purchased in bulk form and bottled in his office. This particular supplement was not in stock when he prescribed it for Anna, but he did not recommend that she buy it elsewhere. Rather, he sold it to her when she came in for her next office visit. The employee to whom he had delegated the responsibility for filling the supplement bottles had accidentally filled the L-glutamine bottles with selenium, a dangerous substance that Dr. Mercola kept in an unmarked container. Anna and her fetus were then poisoned when she took the substance in the bottle that Dr. Mercola had sold to her to treat a medical condition that he had diagnosed. Given these facts, it is unclear how Justice Kilbride could possibly conclude that the injuries to Anna and her fetus were not based on "improper or negligent patient care"; or that Dr. Mercola's sale of supplements was "not associated with" his treatment of patients, was "completely unrelated to his care and treatment of patients," and did not support his medical practice. Justice Kilbride appears to base his conclusion on the rule that, in ruling on a section 2–619 motion to dismiss, pleading and supporting documents must be construed in the light most favorable to the plaintiff. Slip op. at 40-41 (Kilbride, J.,

---

[5]This last assertion is confusing. Section 13–212 merely establishes the time limitations under which suits alleging injuries arising out of care must be brought. It does not eliminate liability for anything.

specially concurring). Justice Kilbride takes this to mean that we must "consider the factual possibility that Dr. Mercola's supplements sales business is separate from his medical practice." Slip op. at 40 (Kilbride, J., specially concurring). Here, however, plaintiffs did not plead that Dr. Mercola's distribution of supplements was separate from his medical practice. Rather, plaintiffs pleaded that Dr. Mercola "failed to utilize proper and adequate measures to insure that proper dietary supplements and prescriptions were being dispensed to *patients* like ANNA MARIE BRUCKER." (Emphasis added.) Moreover, the deposition testimony showed conclusively that the two were not separate. The rule of liberal construction of pleadings and supporting documents does not require a court to consider whether the complaint would have been properly dismissed if the plaintiffs had pleaded the opposite of what they did and had the depositions showed the opposite of what they did. Treating patients with supplements was at the very heart of Dr. Mercola's medical practice, and the connection between the treatment provided to Anna and the injuries to her and her fetus is clear, palpable, and obvious.

Justice Kilbride's concerns about reading "patient care" out of the statute would perhaps better be directed at Justice Burke's special concurrence than at the majority opinion, as Justice Burke has made her desire to do so explicit. Justice Burke objects to any attempt to interpret "arising out of patient care" by considering the meaning of "arising out of" or "patient care." Instead, Justice Burke proposes that we should replace the phrase "patient care" with either "medical malpractice" or "an error in medical judgment." Slip op. at 51 (Burke, J., specially concurring). No explanation is provided for how these terms became synonymous with "patient care." Justice Burke's argument appears to be that, because section 13–212 was enacted in response to a perceived medical malpractice crisis and because courts informally refer to this section as the "medical malpractice statute of repose," we are free simply to ignore the language the legislature chose and to insert "medical malpractice" into the statute. Justice Burke then criticizes the majority for failing to consider whether this is a claim for ordinary negligence rather than medical malpractice because, according to Justice Burke, this is the touchstone for whether the statute applies.

The errors in Justice Burke's approach are manifest. First, we have clear evidence that, when the legislature wants to make healing art malpractice the touchstone for a statute's applicability, it knows how to do so. As we explained above, section 2–622(a), which governs when attorneys' affidavits and health professionals' reports are required, applies to "any action, whether in tort, contract or otherwise, in which the plaintiff seeks damages for injuries or death *by reason of medical, hospital or other healing art malpractice.*" (Emphasis added.) 735 ILCS 5/2–622(a) (West 2006). Thus, the legislature knows exactly how to use the term "healing art malpractice" when that is what it means. Because the legislature instead made section 13–212 applicable when the plaintiff seeks damages for injury or death, whether in tort, breach or contract, or otherwise, *arising out of patient care*, we must presume that the legislature did not intend "patient care" to be synonymous with "medical malpractice." Perhaps the easiest way to state the point is that all medical malpractice claims involve injuries arising out of patient care, but not all injures arising out of patient care were by reason of medical malpractice. The canon of statutory construction that Justice Burke cites in support of her interpretation is that courts must presume that the legislature did not intend absurdity, inconvenience, or injustice. Slip op. at 54 (Burke, J., specially concurring). We fail to see the absurdity, injustice, or inconvenience in concluding that a statute that covers all actions for injuries arising out of patient care applies to a cause of action alleging that a doctor poisoned his own patient by negligently providing her with the wrong substance to treat a medical condition that he had diagnosed.

Second, there is no need to consider whether plaintiffs' claim is one for ordinary negligence or medical malpractice. Both actions are covered by section 13–212(b) if the injury arose out of patient care. Again, section 13–212(b) applies to all actions, "whether in *tort*, breach of contract, or otherwise, arising out of patient care." 735 ILCS 5/13–212(b) (West 2006). Ordinary negligence claims and medical malpractice claims are both tort claims, and both are covered by section 13–212 if the plaintiffs' injury arose out of patient care. The erroneous assertion by Justice Burke that a court must consider whether the claim is one for medical malpractice or ordinary negligence rather than whether the plaintiffs' injury arose out of

patient care causes her to see a conflict with *Heastie v. Roberts*, 226 Ill. 2d 515 (2007), where none exists. As Justice Burke acknowledges, *Heastie* did not address the applicability of section 13–212. Rather, the discussion she references considers whether expert medical testimony would be required to establish the plaintiffs' claim. As we discussed earlier, the class of cases in which a plaintiff would need expert medical opinions is narrower than the class of cases subject to section 13–212. Thus, Justice Burke is wrong when she states that "[i]t simply makes no sense that a claim could be found to be ordinary negligence for the purpose of deciding whether expert testimony is required, yet subject to the medical malpractice statute of repose because it is causally connected to the patient's treatment" (slip op. at 54 (Burke, J., specially concurring)). In fact, it makes perfect sense because ordinary negligence claims are covered by section 13–212 if the plaintiff's injury arose out of patient care.

Next, it is unfortunate that both Justices Kilbride and Burke have decided to lace their separate writings with repeated assertions that the majority adopts "but for" causation when we in fact explicitly reject it. Justice Burke even goes so far as to claim that the majority's interpretation of "arising out of patient care" would apply to a situation in which a doctor sends a patient to get an X-ray and, while there, the plaintiff slips and falls or is hit on the head by something that falls out of a cabinet. In fact, these are the types of injuries that are explicitly excluded under our test. See slip op. at 15-17. When the only connection between the treatment and the injury is that the patient would not have been at a place where an injury occurred but for his treatment or that the treatment placed the plaintiff in a position where he was injured by a neutral force, the injury does not arise out of patient care. Slip op. at 16. In Justice Burke's hypothetical, the accident would not have occurred but for the fact that the patient went to this particular medical provider for treatment, just as it would not have happened but for the fact that the plaintiff was born, or that the plaintiff decided not to cancel the doctor's appointment to go to a baseball game, etc., but the injury was not caused by the patient's care and treatment. By contrast, in the case before us, the plaintiffs' injury was caused *directly by Anna's treatment*. Dr. Mercola diagnosed her with a medical condition, decided to treat the condition by selling her a substance that he had bottled in his office, and Anna

and her fetus were injured because an employee acting under Dr. Mercola's direction placed the wrong substance in the bottle. We are confident in the bench's and bar's ability to see the distinction.

Perhaps the most significant error in both special concurrences, however, is that their analyses are completely divorced from the complaint that plaintiffs filed. Justice Kilbride states that "patient care" was not implicated in the faulty preparation of the supplement containers (slip op. at 47 (Kilbride, J., specially concurring)), and that "Dr. Mercola's potential liability arises, not from the care and treatment he rendered to his patient Anna Marie, but from a nonmedical staff member's negligence in performing ministerial tasks associated with Dr. Mercola's separate supplement sales business, not his medical practice."[6] After ironically stating that "the majority never considers the nature of plaintiff's complaint" (slip op. at 52 (Burke, J., specially concurring)), Justice Burke claims that "the negligence which led to Anna Marie's poisoning *** is based on Pierce's failure to fill containers correctly" (slip op. at 52 (Burke, J., specially concurring)). Again, the specific allegations of negligence that plaintiff pleaded are:

"(a) Improperly distributing selenium to plaintiff ANNA MARIE BRUCKER,

(b) Failed to maintain proper control measures in the distribution of dietary supplements and prescriptions,

(c) Failed to follow reasonable and necessary precautions to determine that proper dietary supplements were being prescribed and distributed,

(d) Dispensed selenium to plaintiff ANNA MARIE BRUCKER in a toxic dosage,

(e) Failed to utilize proper and adequate measures to insure that proper dietary supplements and prescriptions were being dispensed to patients like ANNA MARIE BRUCKER, and

(f) Were otherwise careless and negligent."

---

[6] Justice Kilbride fails to explain from where in the record he has drawn the conclusion that the supplements Barbara Pierce was bottling were not associated with Dr. Mercola's medical practice.

The specially concurring justices may have concluded for themselves that this case is simply about the retail sale of supplements and errors committed by nonmedical personnel, but that is not the lawsuit that plaintiffs filed and those are not the facts that plaintiffs have indicated that they intend to prove. Rather, plaintiffs have alleged that Dr. Mercola–an osteopath whose medical practice consists of treating patients with nutritional supplements–failed to maintain sufficient control procedures over the distribution of supplements to his patients, and that as a direct result of that negligence, his patient, Anna Brucker, was poisoned. Plaintiffs have obtained a report from another osteopath who has reviewed the records and opined that the care and treatment Dr. Mercola provided to Anna Brucker fell below the minimum standard of care and constituted negligence. Several of the plaintiffs' allegations of negligence concern acts that could have been committed only by Dr. Mercola. The specially concurring justices never explain how they have determined that the only allegation of negligence is that Barbara Pierce filled supplement bottles incorrectly.

Finally, it is worth noting that, even under the standard proposed by Justice Burke–that there must be an allegation that the medical provider committed an error in judgment or breached a medical standard of care (slip op. at 51 (Burke, J., specially concurring)), this complaint alleged an injury arising out of patient care. The allegations of negligence center largely on the control procedures in the office, and the record unquestionably shows that Dr. Mercola did exercise judgment in deciding to place a person with no medical training in charge of bottling substances that he intended to use to treat his patients and also in deciding to keep in the office dangerous look-alike substances in unmarked containers. Moreover, plaintiffs have already obtained and attached to their complaint a report from an osteopath stating that Dr. Mercola breached the relevant standard of care. Thus, even if Justice Burke were correct that section 13–212(b) applies only when a complaint alleges that a medical standard of care was breached or when a medical provider's exercise of judgment is involved, plaintiffs' complaint falls within that test.

-27-

Tolling of the Statute of Repose

Plaintiffs contend that their complaint was timely filed because the eight-year repose period provided in section 13–212(b) was tolled until Robert was born. Section 13–212(b) establishes the repose period for minors as eight years after the occurrence or omission alleged to have caused the injury. Section 13–212(c), however, provides a tolling provision:

> "(c) If the person entitled to bring an action described in this Section is, at the time the cause of action accrued, under a legal disability other than being under the age of 18 years, then the period of limitations does not begin to run until the disability is removed." 735 ILCS 5/13–212(c) (West 2006).

Plaintiffs argued in the lower courts that Robert's status as a fetus was a legal disability that tolled the repose period until Robert was born. If the eight-year repose period did not begin to run until Robert was born, then count III of plaintiffs' complaint was timely filed. T h e appellate court held that it did not need to determine whether Robert's status as a fetus at the time the injury occurred was a disability because the relevant time to assess whether Robert was under a disability was not at the time the injury *occurred* but at the time the cause of action *accrued*. 363 Ill. App. 3d at 1025. Prior to 1987, section 13–212 contained the word "occurred" where the current one says "accrued." See Ill. Rev. Stat. 1985, ch. 110, par. 13–212. In 1987, the legislature amended the statute, and the plain language of section 13–212(c) now provides that the repose period is tolled if the person is under a legal disability other than being under the age of 18 at the time the cause of action *accrued*.

The appellate court determined that a cause of action for an injury to a fetus accrues at birth. The appellate court relied on *Simmons v. Weisenthal*, 29 Pa. D. & C.2d 54 (1962), a decision of the Pennsylvania Court of Common Pleas. The question in *Simmons* was when the statute of limitations begins to run when a child is injured while a fetus. The court concluded that the statute runs from the date the child is born rather than from the date of fetal injury. The Pennsylvania court relied in part on the dissent of Justice Boggs in *Allaire v. St. Luke's Hospital*, 184 Ill. 359, 368 (1900) (Boggs, J., dissenting), in which Justice Boggs suggested that liability for an injury to a fetus attaches when the child is born alive. The majority

position in *Allaire* was that there was no cause of action for prenatal injuries. In *Amann v. Faidy*, 415 Ill. 422 (1953), this court reversed *Allaire* and recognized a cause of action under the wrongful-death statute for the death of an infant who, while viable, sustained a prenatal injury due to a third person's negligence. In *Rodriquez v. Patti*, 415 Ill. 496 (1953), this court recognized a common law right of action for personal injuries to a viable fetus when wrongfully injured because of the negligence of a third party. This court would later reject viability as a requirement in a cause of action for prenatal injuries suffered by a fetus due to the negligence of a third person. See *Renslow v. Mennonite Hospital*, 67 Ill. 2d 348 (1977). In *Renslow*, this court stated that "there is a right to be born free from prenatal injuries foreseeably caused by a breach of duty to the child's mother" (*Renslow*, 67 Ill. 2d at 357), and in *Stallman v. Youngquist*, 125 Ill. 2d 267, 275 (1988), this court stated that the injuries to a fetus become apparent at its birth.

The appellate court, relying on these authorities, concluded that, "[b]ecause the fetus's recognized legal right to begin life with a sound mind and body is assertable after birth, *** a claim for prenatal injury on behalf of a fetus accrues when the fetus is born." 363 Ill. App. 3d at 1025. Accordingly, the appellate court held that Robert's cause of action accrued when he was born and, because he was not under a disability other than minority at that time, the statute of repose was not tolled. Thus, the repose period ended eight years after the injury occurred, and count III of plaintiffs' complaint was filed too late.

The appellate court recognized that its decision created a conflict with *Kararo v. Ruiz*, 201 Ill. App. 3d 61 (1990), but the court believed that *Kararo* was wrongly decided. In *Kararo*, the Appellate Court, Third District, held that the eight-year repose period for minors applied to an injury that occurred when the plaintiff was a minor but accrued after the plaintiff reached majority. The plaintiff in that case was born on January 13, 1968, and alleged that the defendant negligently misdiagnosed and treated her until November 16, 1984. The plaintiff alleged that the defendant negligently misdiagnosed her as suffering from Crohn's disease and negligently performed an unnecessary appendectomy on the plaintiff. The complaint alleged that plaintiff learned that she was not suffering from Crohn's disease on July 17, 1987. Plaintiff filed her complaint on January 12, 1989. The

defendant moved to dismiss, arguing that plaintiff's complaint was time-barred. The trial court granted the motion. The trial court ruled that because plaintiff discovered the medical negligence when she was 19, her malpractice claim was subject to the limitations period provided in section 13–212(a) rather than the one provided in section 13–212(b). *Kararo*, 201 Ill. App. 3d at 62.

The plaintiff appealed, and the appellate court reversed. The court stated that the controversy centered on the meaning of the word "accrued" in section 13–212(b). The court noted that, prior to the 1987 amendment, section 13–212 used the word "occurred" rather than "accrued." The court explained that this court has adopted the discovery rule in medical malpractice cases, and that this rule holds that such a cause of action accrues when the person injured learns of his injury or should reasonably have learned of it, and that a form of the discovery rule had been made an explicit part of section 13–212(a). *Kararo*, 201 Ill. App. 3d at 63, citing *Witherell v. Weimer*, 85 Ill. 2d 146 (1981).

The *Kararo* court rejected the defendant's argument that, because plaintiff's cause of action accrued when she was over 18 years of age, the repose period for adults found in section 13–212(a) governed her cause of action rather than the repose period provided for minors in section 13–212(b). Relying on the rules that statutes of limitation must be liberally construed to fulfill the objectives for which they were enacted and that such statutes are consistently construed so as to preserve a minor's right to a day in court, the court held that the applicable repose period is determined by the date the injury occurred rather than the date the cause of action accrued. The court stated that it could find no intent on the part of the legislature to shorten the eight-year period of repose simply because the injury is discovered after the injured party turns 18. The court noted that section 13–212(b) limits plaintiffs to, at most, four years after turning 18 in which to bring the suit and that this time limit coincides with the four-year repose period for adults provided in section 13–212(a). *Kararo*, 201 Ill. App. 3d at 64. The appellate court in the present case stated that *Kararo*'s holding could not be reconciled with the plain language of the statute. 363 Ill. App. 3d at 1026.

Plaintiffs argue that the appellate court erred in refusing to follow *Kararo*. In addition to *Kararo*, plaintiffs rely on *Bruso v. Alexian*

*Brothers Hospital*, 178 Ill. 2d 445 (1997), *S.D. v. Kishwaukee Community Hospital*, 288 Ill. App. 3d 472 (1997), and *Clark v. Han*, 272 Ill. App. 3d 981 (1995). In these cases, the courts examined the 1987 amendment to section 13–212 and determined that the substance of the provision had not changed. In *Bruso*, this court stated:

> "What defendants fail to acknowledge, however, is that in the 1987 amendment to section 13–212, the legislature chose *not* to alter the existing tolling provision that applied to the legally disabled. Other than eliminating minority as a basis for tolling, the 1987 amendment did not change the substance of the tolling provision." (Emphasis in original.) *Bruso*, 178 Ill. 2d at 458.

In *S.D.*, the appellate court held that "[t]he legislature did not change the substance of the tolling provision in the 1987 amendment of section 13–212." *S.D.*, 288 Ill. App. 3d at 477. In *Clark*, the appellate court held that the substance of the tolling provision in subsection (c) was not changed by the 1987 amendment and that the rights "ensured in subsection (c) have not been affected or changed by subsection (b)." *Clark*, 272 Ill. App. 3d at 989. Plaintiffs further point out that, in each one of these cases, the plaintiff was a minor with a legal disability at the time of occurrence and that each decision held that the statute of repose did not begin to run because the minor was disabled at the time of occurrence.

Defendants respond by arguing that plaintiffs are reading too much into these decisions. Defendants acknowledge that these decisions held that the substance of the tolling provision was not altered by the 1987 amendment, but point out that in none of these decisions did the court specifically address the change of the word "occurred" to "accrued." Defendants further argue that in these cases the occurrence of the injury and the accrual of the cause of action happened at the same time, so the courts had no need to address what would happen when the cause of action accrues at a different time than when the injury occurred.

This question is a difficult one of statutory construction. Keeping in mind the principles of statutory construction cited earlier in this opinion, we cannot agree with the appellate court's analysis. According to the appellate court, this case is as simple as saying that the word "accrued" is unambiguous and that a claim for prenatal

injuries accrues at birth. Therefore, the repose period began at the time of the occurrence and was never tolled because Robert was under no disability when he was born. His claim, filed more than eight years after the date of occurrence, was simply too late.

We disagree with the appellate court and hold that the word "accrued," as used in section 13–212, is ambiguous. The law uses the term "accrued" in different ways. Black's defines "accrue" as "[t]o come into existence as an enforceable claim or right; to arise." Black's Law Dictionary 22 (8th ed. 2004). In other words, a cause of action accrues when facts exist that authorize the bringing of a cause of action. See *Walters v. City of Ottawa*, 240 Ill. 259, 263 (1909); *Schreiber v. Hackett*, 173 Ill. App. 3d 129, 131 (1988). This court has held that a tort cause of action accrues when all the elements are present: duty, breach, and resulting injury or damage. *West American Insurance Co. v. Sal E. Lobianco & Son Co.*, 69 Ill. 2d 126, 129-30 (1977). In *Moore v. Jackson Park Hospital*, 95 Ill. 2d 223, 232 (1983), this court held that, in medical malpractice cases in which the discovery rule applies, the cause of action accrues when the plaintiff knows or reasonably should know of an injury and also knows or reasonably should know that it was wrongfully caused. A form of the discovery rule has been incorporated into section 13–212(a). That section provides that causes of actions arising out of patient care must be brought within two years of the date that the claimant knew or should have known of the cause of action, but also provides that no such suit may be brought more than four years after the occurrence alleged to have been the cause of the injury.

Before the 1987 amendment to section 13–212, it was clear that the relevant time at which a person must be disabled to toll the running of the limitations period was generally at the time of the occurrence that caused the injury.[7] The question is whether the

---

[7]Previously, the tolling provision read: "If the person entitled to bring the action is, at the time the cause of action occurred, under the age of 18 years, or under legal disability or imprisoned on criminal charges, the period of limitations does not begin to run until the disability is removed." See Ill. Rev. Stat. 1985, ch. 110, par. 13–212. It is apparent that by using the somewhat awkward phrase "cause of action occurred," the legislature was using "cause of action" simply as meaning "[a] group of operative facts giving rise to one

legislature changed the meaning of this provision when it replaced the word "occurred" with "accrued." Plaintiffs point out a glaring problem with defining "accrued" in section 13–212(c) as having the meaning that it is usually given in medical malpractice cases. Again, section 13–212(c) tolls the running of the limitations period if the person is under a legal disability other than minority at the time the cause of action accrued. If the person is under such a disability, however, would it be possible for the cause of action to accrue? In *Bloom v. Braun*, 317 Ill. App. 3d 720 (2000), the court held that a person is under a legal disability when that person is " ' "incapable of managing [his or] her person or property and could not comprehend [his or] her rights or the nature of the act giving rise to [his or] her cause of action." ' " *Bloom*, 317 Ill. App. 3d at 731, quoting *Sille v. McCann Construction Specialties Co.*, 265 Ill. App. 3d 1051, 1054 (1994), quoting *Tardi v. Henry*, 212 Ill. App. 3d 1027, 1040-41 (1991). Thus, it would seem impossible for a person to be under a disability other than minority when a medical malpractice cause of action *accrued*, because the cause of action would *not* accrue if the person was under such a disability. Defendants claim that plaintiffs' argument on this point "makes no sense" but do not explain why. At oral argument, they were given a second chance to explain why plaintiffs are incorrect on this point and still could not do so. Because we cannot construe a statute in such a way as to render it meaningless, we do not believe that "accrued" in section (c) can be read as referring to a plaintiff's discovery of a cause of action.

For several reasons, then, the most logical way to read "accrued" in sections (b) and (c) is in its more general sense of simply meaning that facts exist that authorize the bringing of the cause of action or that the claim has come into being as an enforceable claim or right. In virtually all cases arising under section 13–212, the facts authorizing the bringing of a cause of action will exist at the time of occurrence. It seems likely that, when the legislature used the word "accrued" in section 13–212, it was using it in a way that would usually coincide with the occurrence. As plaintiffs point out, this court and two

---

or more bases for suing; a factual situation that entitles one person to obtain a remedy in court from another person." See Black's Law Dictionary 235 (8th ed. 2004).

districts of the appellate court have examined the preamendment and postamendment versions of section 13–212's tolling provision and have determined that no substantive change was intended. Using this definition of "accrued" would mean that the provision still has the same meaning as when it read "cause of action occurred." See footnote 3, *supra*. Moreover, subsection (a) has a four-year repose period that begins to run at occurrence and the eight-year repose period in section (b) begins to run at the time of occurrence. Accordingly, when the legislature speaks of tolling these periods in section (c), it makes sense to conclude that the legislature was referring to a tolling at the time that the period would typically begin to run. We also note that, in 1990, the Third District determined that "accrued" in subsection (b) must mean "occurred" (*Kararo*, 201 Ill. App. 3d at 63-64) and that 17 years have now gone by without the legislature amending that provision. Finally, given "accrued" the meaning it is typically given in medical malpractice cases renders subsection (c) nonsensical.

Although the definition of "accrued" that we have used above means that in virtually every case "accrual" and "occurrence" will happen at the same time, the appellate court correctly pointed out that this is not necessarily the case when the injury is to a fetus. As explained earlier, courts, including this one, have generally held that a cause of action for prenatal injuries cannot be maintained until birth. Thus, when a fetus is injured, the occurrence of the injury and the accrual of the cause of action take place at different times. Because no suit may be maintained until birth, that is the time at which facts exist that authorize the bringing of a cause of action and that the claim has come into being as an enforceable claim or right. We disagree with the appellate court and the defendants, however, that this means that the statute of repose began to run while Robert was still a fetus.

Indeed, the very case that defendants and the appellate court relied upon–*Simmons*–held that a statute of limitations for prenatal injuries may *not* begin to run until the child is born. The court determined that a cause of action for prenatal injuries accrued at birth, but then drew the opposite conclusion from the one defendants want this court to draw. Because the cause of action could not be maintained until birth, the court held that the statute of limitations could not begin to run until birth. See *Simmons*, 29 Pa. D. & C.2d at 56-57. The defendants

might respond that *Simmons* did not set forth the statutory language at issue but referred to it as a "statute of limitations." This court has referred to section 13–212(b) as a "statute of repose" and explained that a statute of limitations governs the time within which lawsuits may be commenced after accrual, but that statutes of repose extinguish causes of action after a fixed period of time after a specified event occurs. *Ferguson v. McKenzie*, 202 Ill. 2d 304, 311 (2001).

Nevertheless, in *LaBello v. Albany Medical Center Hospital*, 85 N.Y.2d 701, 651 N.E.2d 908, 628 N.Y.S.2d 40 (1995), the Court of Appeals of New York reached the same conclusion as the *Simmons* court, and the statute at issue there–like the Illinois statute–ran from the date of the occurrence. The plaintiff in that case brought an action on behalf of her 12-year-old son for alleged prenatal injuries. The court had to determine if the limitations period began to run on the date of occurrence or the date of birth. On this point, the statute could not have been clearer:

> "An action for medical, dental or podiatric malpractice must be commenced within two years and six months of *the act, omission or failure complained of* or last treatment where there is continuous treatment for the same illness, injury or condition which gave rise to the said act, omission or failure; provided, however, that where the action is based upon the discovery of a foreign object in the body of the patient, the action may be commenced within one year of the date of such discovery or of the date of discovery of facts which would reasonably lead to such discovery, whichever is earlier. For the purpose of this section the term 'continuous treatment' shall not include examinations undertaken at the request of the patient for the sole purpose of ascertaining the state of the patient's condition. For the purpose of this section the term 'foreign object' shall not include a chemical compound, fixation device or prosthetic aid or device." (Emphasis added.) N.Y. C.P.L.R. §214-a (McKinney 2003).[8]

---

[8]A 10-year infancy toll also applied to the plaintiff's case. See N.Y. C.P.L.R. §208 (McKinney 2003).

The supreme court, appellate division, over the dissent of two justices, held that the limitations period began to run on the date of the occurrence that led to the injury. *LaBello v. Albany Medical Center Hospital*, 200 A.D.2d 299, 614 N.Y.S.2d 459 (1994). The court of appeals unanimously reversed. The court held that, as a matter of policy, the limitations period could not begin running prior to the attachment of liability and prior to the time the infant had a legal right to sue. The court relied in part on this court's decision in *Walters*, 240 Ill. at 263, in which this court explained that no cause of action exists until the claimant can legally sue. If liability did not attach until birth, and the infant had no cause of action until birth, then the limitations period must also begin to run at birth. *LaBello*, 85 N.Y.2d at 704-06, 651 N.E.2d at 909-10, 628 N.Y.S.2d at 41-42. The court recognized that the statute provided for only two exceptions to the commencement of the limitations period on the date of occurrence: continuous treatment and foreign object left in the body. The court held, however, that it was not creating a new exception. Rather, it was "tak[ing] the statute on its own terms and apply[ing] it to this unenvisaged circumstance." *LaBello*, 85 N.Y.2d at 706, 651 N.E.2d at 911, 628 N.Y.S.2d at 43.

In *Bailey v. Khoury*, 891 So. 2d 1268 (La. 2005), the Supreme Court of Louisiana reached the same conclusion when construing a statute that provided a limitations period of one year from the date of the occurrence, or one year from the date of discovery, but in no event more than three years from the date of the occurrence. In that case, the child was injured *in utero* when her mother took the prescription drug Depakote. Through an ultrasound test, the pregnant mother learned that birth defects were certain. She brought suit on her own behalf and on behalf of the child, and the defendants argued that the limitations period began when the mother learned of the birth defects, six months before the child was born. At that time, the occurrence had happened and the mother had discovered the injury.

Nevertheless, with regard to the mother's claim on behalf of her child, the Supreme Court of Louisiana responded to the defendants as follows:

> "As indicated in the introduction to this opinion, the specific argument set forth by the defendants is apparently unique in the reported case law. In fact, we have not

discovered any reported cases that have considered an argument that, under the discovery rule, the statutory period for filing suit seeking damages arising from birth defects or other prenatal injuries should commence on a date prior to the child's birth when the parent acquired knowledge of the birth defects as a result of a medical procedure. Rather, the reported cases generally fall into two categories: (1) those holding that the statutory period for filing suit commences on the date of the child's birth, and (2) those applying the discovery rule and holding that the statutory period for filing a suit for damages arising from birth defects or other prenatal injuries does not begin until the date after the child's birth when the cause of the birth defects was discovered." *Bailey*, 891 So. 2d at 1278.

The court ultimately concluded that the limitations period could not begin to run until birth:

" 'It is apparent that liability for a prenatal injury attaches at the earliest possible time upon birth of the infant, whether recovery is allowed for a live or a still birth. If liability does not attach until birth, whether alive or still, there is what has been termed "an implied condition" that the child be born. We do not see, therefore, how the statute of limitations can possibly begin to run until fulfillment of the implied condition that the child be born, at which time liability will attach. Until there is liability there can be no right upon which an action could be brought, and until a right exists the statute cannot run.' " *Bailey*, 891 So. 2d at 1282, quoting *Simmons*, 29 Pa. D. & C.2d at 55-56.

The court relied in part on a law review article that had criticized the lower appellate court's ruling in *La Bello*. See *Bailey*, 891 So. 2d at 1279, citing J. Chow, *Civil Practice Law and Rules*, 69 St. John's L. Rev. 675 (1995).

The Supreme Court of Texas reached the opposite result in *Brown v. Shwarts*, 968 S.W.2d 331 (1998). In *Brown*, the plaintiffs brought a wrongful-death action on behalf of their son, alleging that negligent prenatal care led to their son's death one day after he was born. They filed their suit 2 years and 76 days after the treatment alleged to have caused the injury. The statute in question provided a limitations period

of two years from "the occurrence of the breach or tort or from the date the medical or health care treatment that is the subject of the claim or the hospitalization for which the claim is made is completed." Tex. Rev. Civ. Stat. Ann. art. 4590i, §10.01 (Vernon Supp. 1998). Providing notice of such a claim tolled the running of the limitations period for 75 days, giving health-care liability claimants 2 years and 75 days to file claims. *Brown*, 968 S.W.2d at 333. The plaintiffs argued that, because a health-care liability claim was defined by statute as an action for injury or death to a patient, the limitations period could not begin to run until the child was born. The plaintiffs reasoned that a fetus cannot be a patient. The Texas Supreme Court rejected this argument, noting that if a fetus could not be a patient, then plaintiffs would have no claim at all. The court acknowledged that a claim on behalf of a fetus is actionable if the child is later born alive, but held that the limitations period runs from the date of the occurrence. *Brown*, 968 S.W.2d at 333-34.[9]

Faced with these divergent lines of reasoning, we prefer the position taken by the New York and Louisiana courts: because liability does not attach until birth and because there is no right to bring a cause of action until birth, the limitations period cannot begin to run until birth. The New York court reached this conclusion even though the limitations period in its statute–as with the Illinois

---

[9]Interestingly, however, the Texas Supreme Court would later apply reasoning similar to that of the New York and Louisiana courts when construing a different statute. In *University of Texas Southwestern Medical Center v. Loutzenhiser*, 140 S.W.3d 351 (Tex. 2004), the plaintiff claimed that her son was born with a severely deformed hand that was caused by a prenatal test performed by the University of Texas Southwestern Medical Center. At issue was when the six-month notice period began to run under a statute that required notice of claims against governmental units. The statute's plain language provided that notice was required "not later than six months after the day that the incident giving rise to the claim occurred." Tex. Civ. Prac. & Rem. Code Ann. §101.101(a) (Vernon 2005). The court held that, in the case of an injury to a fetus, the six-month period begins at live birth. The court reasoned that, because no injury could be maintained for a prenatal injury until live birth, there were two incidents giving rise to the claim: (1) the occurrence that caused the injury; and (2) live birth. *Loutzenhiser*, 140 S.W.3d at 356-57.

statute–ran from the date of the occurrence. The New York and Louisiana cases contain extensive discussions of the policy concerns at issue, while the Texas court summarily disposed of the issue without considering these concerns. Nothing would seem more repugnant to basic notions of fundamental fairness than to hold that the clock is ticking on someone's right to file suit during a period in which the law forbids that person from filing suit. We would be loathe to render such a holding generally, but we will definitely not do so here where the rights of a minor to seek redress for his injuries are at stake. As we noted earlier, this court has stated that "it has long been the public policy of this state that courts should carefully guard the rights of minors and that a minor should not be precluded from enforcing his or her rights unless clearly barred from doing so." *Bruso*, 178 Ill. 2d at 454-55. We do not find in section 13–212 a clear bar to Robert's suit. The courts have been struggling to determine the meaning of this section for 20 years, and today we hold it to be ambiguous. We find extremely farfetched any notion that the legislature worded the statute the way it did in order to provide different time limits for children injured *in utero* and children injured after birth. Rather, we agree with *LaBello*'s conclusion that this is simply an unenvisaged circumstance. Absent some clear expression from the legislature that its intent in section 13–212 was to run the repose period against someone who was legally forbidden from going to court and to shorten the time period in which children injured *in utero* may bring a cause of action, we hold that the repose period in section 13–212(b) cannot begin to run until the child is born. Accordingly, count III of plaintiffs' complaint, filed within eight years of Robert's birth, was timely filed.

CONCLUSION

Plaintiffs' complaint, which alleged that Anna and Robert were poisoned when defendants negligently sold Anna the wrong substance to treat a medical condition that Dr. Mercola had diagnosed, alleged an injury arising out of patient care. Accordingly, count III of plaintiffs' complaint is subject to the eight-year repose period in section 13–212(b). Because Robert was a fetus at the time of the occurrence that led to his injury, however, the eight-year period did not begin to run until he was born and had a right to pursue his claim

in court. Count III was thus timely filed, and we reverse the judgment of the appellate court, which upheld the dismissal of count III.

*Appellate court judgment reversed;*
*circuit court judgment reversed;*
*cause remanded.*

JUSTICE KILBRIDE, specially concurring:

While I agree with the result reached in this case, I reject the majority's application of the phrase "arising out of patient care" in the medical malpractice statute of repose. The majority's application of the statute effectively applies a "but for" causation test and places too much emphasis on the statute's "arising out of" language, with insufficient emphasis on the fundamental "patient care" component. The majority's resultant finding that the negligent conduct in this case arose out of "patient care" leads to the erroneous conclusion that count III of the Bruckers' complaint was subject to the repose period of section 13–212(b). I believe the motion to dismiss should have been denied. The statute does not apply because Dr. Mercola's sale of dietary supplements does not "arise out of patient care" under section 13–212 and the case law of this state when that phrase is applied with the proper balance between its component parts. Only if it is improperly extended to include "but for" causation does the statute apply in this case. Contrary to the majority's contention (slip op. at 17 n.4), I do not believe this court's traditional construction of "arising out of" is unworkable. Rather, I believe an erroneous *application* of that test conflicts with this court's precedents and the intent of the legislature.

In the Bruckers' complaint, count III asserts injuries arising out of negligence associated with Dr. Mercola's sale of mislabeled supplements. On appeal, the Bruckers argue that Dr. Mercola's supplement sales constitute a separate enterprise from his medical practice, taking it outside the realm of "patient" care under section 13–212. For purposes of reviewing a dismissal under section 2–619, we must consider the factual possibility that Dr. Mercola's supplement sales business is separate from his medical practice. See *Paszkowski v. Metropolitan Water Reclamation District of Greater Chicago*, 213

-40-

Ill. 2d 1, 5 (2004) (stating that in reviewing a dismissal order under section 2–619, courts must interpret all pleadings and supporting documents in the light most favorable to the nonmoving party and grant dismissal only if recovery is impossible under *any* potential set of facts).

Thus, our inquiry must be limited to whether the negligent conduct alleged in count III constitutes "patient care" under this, or any other, possible set of facts. In my view, if Dr. Mercola's supplement sales are separate from his medical practice, the medical malpractice statute of repose is not applicable because those sales would not constitute "patient care." Our case law supports this conclusion. See *Hayes v. Mercy Hospital & Medical Center*, 136 Ill. 2d 450 (1990); *Cammon v. West Suburban Hospital Medical Center*, 301 Ill. App. 3d 939, 942 (1998); *Walsh v. Barry-Harlem Corp.*, 272 Ill. App. 3d 418, 420 (1995); *Miller v. Tobin*, 186 Ill. App. 3d 175, 176-77 (1989). See also *Stiffler v. Lutheran Hospital*, 965 F.2d 137 (7th Cir. 1992).

In *Hayes*, 136 Ill. 2d at 457, this court explained the legislative intent behind section 13–212's statute of repose. We noted that our legislature limited the time for filing medical malpractice cases due to a perceived crisis in the medical malpractice insurance industry. The legislature deemed the time limitation "necessary to prevent extended exposure of physicians and other hospital personnel to potential liability *for their care and treatment of patients*, thereby increasing an insurance company's ability to predict future liabilities" and reducing malpractice insurance premiums. (Emphasis added.) *Hayes*, 136 Ill. 2d at 458. We then concluded that this objective would be advanced only if the statutory provision was read "to limit a physician's exposure to liability for damages for injury or death *arising out of patient care* under all theories of liability." (Emphasis added.) *Hayes*, 136 Ill. 2d at 459. Thus, the contribution action in *Hayes* was subject to section 13–212 because the contributor's obligation was based on his underlying tort, regardless of the legal theory of liability asserted in the third-party action.

*Hayes* noted that complaints need not allege medical malpractice to fall within the medical malpractice statute of repose. *Hayes*, 136 Ill. 2d at 459. Plaintiffs may not escape that limitation simply by applying a different legal label to a damage claim arising out of patient care. *Hayes* did not hold, however, that every cause of action brought

against a covered medical provider is subject to section 13–212. Nor did it hold that section 13–212 encompasses all causes of action where a doctor-patient relationship exists. Rather, *Hayes* explained that the legislature's purpose in enacting the statute is furthered only when the alleged injury arose out of patient care.

Here, application of the statute of repose does not advance the legislative purpose underlying section 13–212 because the injury alleged was not based on improper or negligent patient care. Our appellate court has previously addressed the scope of the term "patient care." In *Walsh*, 272 Ill. App. 3d at 422, our appellate court provided guidance on the limits of the statutory phrase "arising out of patient care." After the plaintiff's medical malpractice complaint was dismissed for failing to include a mandatory physician's affidavit, the plaintiff filed a new complaint, alleging the defendants violated the Consumer Fraud and Deceptive Business Practices Act by " 'falsely represent[ing]' " the plaintiff's need for cataract surgery. *Walsh*, 272 Ill. App. 3d at 421. The defendants sought dismissal under section 13–212(a), and the plaintiff countered that the section did not apply because his complaint did not arise out of patient care. The appellate court affirmed the dismissal order, noting that the complaint claimed injuries arising out of patient care because "the plaintiff's *allegations of misconduct were inextricable from the defendants' diagnosis and treatment* of his eyes." (Emphasis added.) *Walsh*, 272 Ill. App. 3d at 425. Thus, section 13–212 applied even though the plaintiff alleged fraud, not medical malpractice. Rewording the claim to fit into a different legal theory did not change the true basis of the claim, patient care. *Walsh*, 272 Ill. App. 3d at 425.

Similarly, in *Stiffler*, 965 F.2d 137, the plaintiff argued that section 13–212(a) did not bar a product liability claim against a hospital because the implantation of a defective prosthetic device during hiatal hernia surgery was "unrelated to her medical treatment." She argued that the injury resulted from the hospital's "negligent choice and distribution of a defective prosthetic device." *Stiffler*, 965 F.2d at 140. The United States Court of Appeals for the Seventh Circuit disagreed, explaining that the hospital had not "sold" the device to her, but had only used it as part of her treatment. *Stiffler*, 965 F.2d at 141. As part of the plaintiff's medical treatment, the implantation of the device fell within the phrase "arising out of patient care" in section 13–212.

Notably, the *Stiffler* court also expressly acknowledged the possibility that not all causes of action against a medical provider arise out of patient care. *Stiffler*, 965 F.2d at 141. See also *Heastie*, 226 Ill. 2d at 551 (noting that "[n]ot every injury sustained by a patient in a hospital results from healing-art malpractice"), citing *Giegoldt v. Condell Medical Center*, 328 Ill. App. 3d 907, 911 (2002).

In this case, the facts are distinguishable from *Stiffler* because Dr. Mercola's erroneous sale of selenium was not part of Anna Marie's treatment plan. The prosthetic device implanted in *Stiffler* was an integral component in the patient's treatment plan. Unlike the prosthetic device in *Stiffler*, Anna Marie could have purchased the supplement Dr. Mercola recommended from any vendor. She was not required to purchase L-glutamine from Dr. Mercola.

In *Cammon*, 301 Ill. App. 3d at 942, the plaintiff filed suit against a hospital when her husband died of cardiopulmonary arrest shortly after surgery. One count of the complaint sought damages based on the hospital's alleged spoliation of evidence, allegedly prejudicing her additional claims of medical malpractice. The trial court dismissed the count as time-barred under section 13–212(a). *Cammon*, 301 Ill. App. 3d at 943. The appellate court reversed, holding that the hospital's alleged breach of its duty to preserve evidence did not implicate any medical standard of care to bring it within the statutory requirement that the claim arise out of "patient care." *Cammon*, 301 Ill. App. 3d at 950-51. While the court acknowledged that establishing damages in the spoliation claim required the plaintiff to prove the underlying medical negligence claim, it held that this connection did not transform the spoliation claim into one seeking recovery for "the breach of a medical standard of patient care." *Cammon*, 301 Ill. App. 3d at 950.

Applying the guidance offered by these cases, section 13–212's scope of coverage depends upon whether the complaint alleges that the defendant's wrongful conduct, error, or omission arose out of the *medical care or treatment* rendered to the patient, not by the legal theory asserted in the complaint. An allegation that the injury would not have occurred "but for" the doctor-patient relationship is insufficient to establish that the injury arose out of patient care. An overbroad application does not advance the legislative objective of "prevent[ing] extended exposure of physicians and other hospital personnel to potential liability *for their care and treatment of*

*patients.*" (Emphasis added.) *Hayes*, 136 Ill. 2d at 458. Notably, the legislature did not express an intent to shield medical providers from liability in all endeavors, including those not associated with patient care. Any interpretation supporting that intention effectively reads the term "patient care" out of the statute, in violation of our traditional rules of statutory construction. *People ex rel. Ryan v. Agpro, Inc.*, 214 Ill. 2d 222, 227 (2005).

Here, the legislative intent is not advanced by a finding that the negligent conduct alleged fell under the umbrella of "patient care." Dr. Mercola diagnosed Anna Marie's condition and instituted a treatment plan as part of his medical practice. Under that plan, he recommended that she take the dietary supplement L-glutamine. That recommendation is not, however, the basis for plaintiffs' damage claim. The Bruckers do not allege that L-glutamine was improperly recommended nor that Dr. Mercola recommended that Anna Marie take selenium supplements. The complaint alleged injuries resulting from Anna Marie's ingestion of selenium from one of several containers erroneously filled by one of Dr. Mercola's nonmedical employees as part of the employee's duties supporting the sale of dietary supplements, not the medical practice. The container was not prepared specifically for Anna Marie as part of her treatment plan. Thus, the claimed damages did not originate in Dr. Mercola's medical diagnosis and treatment plan. If Anna Marie had been injured as a result of taking the L-glutamine Dr. Mercola recommended, her claim unquestionably would have arisen out of the recommended treatment and would have constituted "patient care." That is not what happened, however.

Here, Anna Marie purchased the improperly labeled supplement from a shelf in the reception area. The product was readily available without a prescription to both patients and nonpatients. No medical license was required to dispense the supplements. Although Dr. Mercola sold most of his supplements to his patients, nonpatients could, and sometimes did, purchase supplements from his office. Unlike the majority (slip op. at 20), I believe the relevant question is not whether Dr. Mercola would make the business decision to sell his supplements to the general public or only to his patients but rather whether his sale of supplements to a member of the general public would cause that customer to become his "patient." Anna was

undoubtedly a patient in Dr. Mercola's medical practice, but her decision to purchase the supplements from his retail sales business was in her role as an ordinary consumer. Surely if a member of the general public had purchased the supplements from Dr. Mercola's office, it would have constituted an ordinary consumer sale, not an act of "patient care." Simply selling supplements to a member of the general public does not instantly transform the purchaser into one of Dr. Mercola's patients. If that were not true, then each of Dr. Mercola's supplement sales would be an act of "patient care," making each purchaser into a "patient" under the statute, despite the lack of any prior therapeutic relationship. I reject that overbroad interpretation of "patient care."

Nonetheless, it may be possible for Dr. Mercola's sale of a supplement to an existing patient to constitute "patient care" if the purchase was based on his specific instruction as the patient's physician to purchase the item *only* from his office. Those are not the facts in this case, however, and that issue is not before this court. Despite the majority's concern that Dr. Mercola did not "recommend" that Anna buy the supplement elsewhere when it was initially out of stock in his office (slip op. at 22), there is no indication in the record that he *ever "recommended" any particular sales outlet, including his own*. Nor is there any indication in the record that Dr. Mercola personally "sold" the supplement to Anna when it was back in stock. See slip op. at 22. Similarly, the majority points out that "plaintiffs did not plead that Dr. Mercola's distribution of supplements was separate from his medical practice" (slip op. at 23), but neither did they plead that the two were *inseparable*. That remains a question of fact that must be determined at trial, after the completion of discovery. Contrary to the majority's contention (slip op. at 27), I have not conclusively determined that Dr. Mercola's supplement sales could not be part of his medical practice, even though it is clear that the bottling errors alleged were made by a member of his nonmedical staff.

Although the majority correctly states that "[t]he rule of liberal construction of pleadings *** does not require a court to consider whether the complaint would have been properly dismissed if the plaintiffs had pleaded the opposite of what they did" (slip op. at 23), the pleadings in this case did *not* allege that the supplement sales and

licensed medical practices were one and the same. Based on the record before this court, the critical point is that the office's sale of the majority of its supplements to Dr. Mercola's patients does not convert a retail business enterprise into patient care, as specified in section 13–212.

As in *Cammon*, here the damages did not arise out of any alleged breach of a duty to provide proper medical care. Rather, the damages arose out of negligence in the preparation and sale of consumer goods and was strictly related to Dr. Mercola's retail supplement sales. Thus, the gravamen of the Bruckers' claim is not improper patient care. The majority's emphasis on the "arising out of" portion of section 13–212 fails to take into account the inapplicability of the remainder of that key phrase, "*patient care*." Because patient care was not implicated in the faulty preparation of the supplement containers, the Bruckers' claim could not have "arisen out of patient care."

Although the majority expressly disavows "but for" causation in construing the phrase "arising out of patient care" (slip op. at 17), it finds that the alleged injuries arose out of Dr. Mercola's treatment of Anna Marie. Those injuries, however, arose out of "patient care" only in the broad sense that "but for" Dr. Mercola's recommendation that Anna Marie take L-glutamine, she would not have purchased the improperly filled container and mistakenly ingested selenium. Therefore, "but for" causation is precisely the test for "arising out of patient care" applied by the majority, despite its express rejection of that test. The majority's assertion that I have mistakenly "lace[d] [my] separate writing[ ] with repeated assertions that the majority adopts 'but for' causation" misreads the clear meaning of my language. Slip op. at 25. I firmly believe the majority has "adopted" the proper test but has failed to apply it properly in this instance. It is the majority's overly broad *application* of our traditional interpretation of the "arising out of" component of the phrase that is unworkable and contrary to the intent of our legislature.

Any application of the phrase "arising out of patient care" that includes "but for" causation sweeps too broadly and in ways that were unintended by the legislature's enactment of the medical malpractice statute of repose. For instance, here the application of a broad "but for" causation permits Dr. Mercola to escape liability for ordinary negligence associated with his sale of supplements when that sale was

completely unrelated to the medical care and treatment of his patient, *i.e.*, "patient care." As we recognized in *Hayes*, the legislature enacted the time limitation in section 13–212 "to prevent extended exposure of physicians and other hospital personnel to potential liability *for their care and treatment of patients*" and consequently reduce malpractice insurance premiums. (Emphasis added.) *Hayes*, 136 Ill. 2d at 458. It was not intended to eliminate medical providers' liability in causes of action unrelated to the "care and treatment of patients" after the limitations period.

Because a section 2–619 motion to dismiss can only be granted if no recovery is available under any possible set of facts, the trial court erred in granting the defendants' motion in this case. Under the facts outlined here, Dr. Mercola's potential liability arises, not from the care and treatment he rendered to his patient, Anna Marie, but from a nonmedical staff member's negligence in performing ministerial tasks associated with Dr. Mercola's separate supplement sales business, not his medical practice. The majority questions how pleading allegations directly involving Dr. Mercola's actions and the mislabeled supplements bottled by an employee could not be associated with his medical practice. Slip op. at 26-27, 26 n.6. The answer is simple: Dr. Mercola's actions as a licensed osteopathic physician in his medical practice are separable from his actions as an unlicensed purveyor of supplements. If Dr. Mercola cannot undertake these two separable roles, as the majority appears to contend, then each sale of supplements must constitute "patient care," even when those sales are to members of the general public who have not previously been patients in Dr. Mercola's medical practice.

The allegations cited by the majority (slip op. at 26-27) do not specifically contend that two parts of Dr. Mercola's business are inseparable or that Dr. Mercola's allegedly negligent conduct took place in the context of his medical practice rather than his supplement business.

For these reasons, I conclude that count III of the Bruckers' amended complaint did not set forth a claim "arising out of patient care" and, thus, is not subject to the medical malpractice statute of repose found in section 13–212(b). Accordingly, I specially concur in the majority's judgment.

JUSTICE BURKE, also specially concurring:

I agree with the majority that count III of plaintiffs' amended complaint was improperly dismissed. My reasons for reaching this conclusion, however, are quite different from the majority.

I disagree with the majority's discussion of the term "arising out of patient care" and its finding that count III of plaintiff's third amended complaint is subject to the eight-year statute of repose period found in section 13–212(b) of the Code (735 ILCS 5/13–212(b) (West 2002)). In my view, count III should not have been dismissed because it is not subject to the medical malpractice statute of repose. Accordingly, I would not reach the issue concerning the tolling of that provision.

ANALYSIS

At issue in this appeal is the proper construction of section 13–212(b) of the Code, commonly referred to as the medical malpractice statute of repose. This section provides in pertinent part:

"(b) Except as provided in Section 13–215 of this Act [735 ILCS 5/13–215], no action for damages for injury or death against any physician, dentist, registered nurse or hospital duly licensed under the laws of this State, whether based upon tort, or breach of contract, or otherwise, arising out of patient care shall be brought more than 8 years after the date on which occurred the act or omission or occurrence alleged in such action to have been the cause of such injury or death where the person entitled to bring the action was, at the time the cause of action accrued, under the age of 18 years ***." 735 ILCS 5/13–212(b) (West 2002).

Construing this statute, the majority holds that "the applicability of section 13–212 turns on whether the plaintiff alleged an injury 'arising out of patient care.' " Slip op. at 15. The majority then goes on to define "arising out of patient care" as "a causal connection between the patient's medical care and the injury." Slip op. at 17. The majority states that this is not a "but for" test, but that "it clearly covers any injuries that have their origin in, or are incidental to, a patient's medical care and treatment." Slip op. at 17.

I disagree with the majority's interpretation of the phrase "arising out of patient care." By holding that an injury must be "causally connected" to the patient's medical care, the majority has determined that the medical care and treatment must be the cause-in-fact of the injury. This court has held, however, that in the context of a negligence claim, "cause-in-fact is 'but for' cause." *Price v. Philip Morris, Inc.*, 219 Ill. 2d 182, 269 (2005); *Evans v. Shannon*, 201 Ill. 2d 424, 434 (2002). Thus, the majority has, in fact, adopted a "but for" test, despite its protestations to the contrary. In light of the above, the majority's definition sweeps far too broadly.

The difficulties with the majority's definition become apparent when one tries to apply it. Consider, for example, a situation where a doctor-patient relationship exists and the doctor recommends a certain course of action to his patient. Clearly, any injury that occurs because the patient followed the doctor's orders would be "causally related" or "incidental to" the patient's medical care and treatment. Therefore, if a patient obtains an X-ray at the recommendation of his or her doctor and, while there, slips and falls or is struck on the head by a piece of machinery or an item falling from a cabinet, such injuries would be encompassed by the majority's definition.

The majority, as noted, denies that it has adopted a "but for" test and explicitly denies that cases involving a slip and fall or being hit on the head would fall within its statutory interpretation. It is important to note, however, that the majority never explains how, under the logic of its "causal connection" analysis, these cases can be excluded. In short, the majority offers no principled or reasoned means for deciding when the statute of repose applies. What we are left with is a "but for" test that has no boundaries except for those imposed, *ad hoc*, by the judge attempting to apply it. The legislature could not have intended to create such a vague and overly broad test.

Further, by focusing on the term "arising out of" and not the statutory provision as a whole, the majority loses sight of the purpose and objective of the statute. In *Hayes v. Mercy Hospital & Medical Center*, 136 Ill. 2d 450 (1990), we explained the rationale behind the General Assembly's enactment of the medical malpractice statute of repose. We said:

> "As previously discussed by this court (see, *e.g.*, *Anderson v. Wagner* (1979), 79 Ill. 2d 295), when the General Assembly

*limited the time period in which a party could bring a suit for medical malpractice*, it was faced with what it perceived as a medical malpractice insurance crisis. *** The legislature therefore enacted, among other provisions, an outside time limit of five years, later amended to four, in which an action could be brought against physicians and hospitals for actions arising out of patient care (Pub. Act 79–960, eff. Nov. 11, 1975; Ill. Rev. Stat. 1975, ch. 83, par. 22.1). (*Mega v. Holy Cross Hospital* (1986), 111 Ill. 2d 416, 427.) This definite period in which an action could be filed was viewed as necessary to prevent extended exposure of physicians and other hospital personnel to potential liability *for their care and treatment of patients*, thereby increasing an insurance company's ability to predict future liabilities. (See *Anderson*, 79 Ill. 2d at 307.) This increased ability to predict liability was meant to assist in reducing health-care malpractice insurance premiums." (Emphases added.) *Hayes*, 136 Ill. 2d at 457-58.

Thus, it was our conclusion in *Hayes* that the General Assembly enacted section 13–212 to limit "the time period in which a party could bring a suit for medical malpractice" in order to achieve the goal of reducing medical malpractice insurance premiums. We then held that this objective would be advanced only if the statutory provision was read broadly so as to "limit a physician's exposure to liability for damages for injury or death arising out of patient care under all theories of liability." *Hayes*, 136 Ill. 2d at 459. Thus, in light of the legislative purpose, we found it appropriate to look past the legal theory upon which the plaintiff styled his or her claim. The medical malpractice statute of repose would apply if the medical provider's liability was based, ultimately, on medical negligence. Consequently, in *Hayes*, we held that an action for contribution was subject to the medical malpractice statute of repose because

"[t]he action for contribution apportions the damages among the parties responsible for the original plaintiff's injury, and the contributor is obligated for the damages directly created by the contributor's negligent actions. The third-party plaintiff, therefore, is seeking from the third-party defendant those damages proximately caused by the negligent acts of the third-party defendant which the third-party plaintiff may be

-50-

obligated to pay in the underlying suit." *Hayes*, 136 Ill. 2d at 457.

*Hayes* makes clear that a plaintiff's complaint need not be framed as a medical malpractice cause of action to come within the rubric of the medical malpractice statute of repose contained in section 13–212. Rather, when deciding whether section 13–212 limitations periods apply, the injury must arise out of patient care. An injury will arise out of patient care if the medical professional commits an error in medical judgment or breaches a medical standard of care to which he is held, *i.e.*, if the medical professional commits malpractice. Thus, the relevant question to be asked is, "Is the plaintiff's claim one seeking recovery for medical negligence?" If so, the plaintiff will not be able to escape the section 13–212 limitations periods simply by casting his or her claim in terms of some other legal theory or cause of action. See, *e.g.*, *Walsh v. Barry-Harlem Corp.*, 272 Ill. App. 3d 418 (1995); *Stiffler v. Lutheran Hospital*, 965 F.2d 137 (7th Cir. 1992).

By the same token, a cause of action will not be subject to the limitations periods set forth in section 13–212 simply because it is brought against a physician or other covered medical provider. Nor will section 13–212 encompass causes of action which do not seek recovery for medical negligence simply because a doctor-patient relationship exists between the plaintiff and defendant. See, *e.g.*, *Cammon v. West Suburban Hospital Medical Center*, 301 Ill. App. 3d 939 (1998). This is because the legislative purpose in enacting section 13–212 is furthered only when the provision is applied where the underlying basis for the claim is medical negligence.

It is my view, therefore, that when deciding whether the medical malpractice statute of repose applies to a particular cause of action, the determinative question must be whether the wrongful conduct which is the basis for the claim is medical negligence, as opposed to ordinary negligence. Only by requiring the wrongful conduct to be a matter of medical negligence, *i.e.*, medical malpractice, do we further the purpose and goals of the statute.

A good illustration of this principle is found in *Cammon*. The plaintiff in *Cammon* brought a claim for spoliation of evidence against the hospital, arguing that the loss of evidence compromised her medical negligence suit. Finding that this claim was not subject to the medical malpractice statute of repose, the appellate court held:

"The breach of duty necessary to support a medical negligence action is the defendant's deviation from the proper medical standard of patient care. *Borowski v. Von Solbrig*, 60 Ill. 2d 418, 423, 328 N.E.2d 301 (1975). The damages suffered in such an action arise out of inappropriate patient care. By contrast, a negligence action for spoliation of evidence is predicated upon a breach of duty to preserve evidence. *Boyd v. Travelers Insurance Co.*, 166 Ill. 2d 188, 195, 652 N.E.2d 267 (1995). Although the plaintiff in an action alleging the negligent destruction of evidence resulting in an inability to prove a cause of action for medical negligence must prove the merits of the underlying medical negligence claim (see *Boyd*, 166 Ill. 2d at 197-98), the fact remains that the damages suffered by the plaintiff in such a case arise from the defendant's destruction of evidence, not the breach of a medical standard of patient care." 301 Ill. App. 3d at 950.

In the case at bar, the majority does not overturn *Cammon*, but attempts to distinguish it, holding "[t]he injury plaintiff suffered was to her ability to prove her lawsuit, and that injury did not arise out of patient care." Slip op. at 15. What the majority fails to acknowledge, however, is that the *Cammon* plaintiff's spoliation-of-evidence claim would, in fact, be subject to the medical malpractice statute of repose if the majority applied its own definition of "arising out of patient care." This is because the spoliation-of-evidence claim was causally connected to, had its "origin in," and was "incidental to" the plaintiff's medical treatment. See slip op. at 17. Clearly then, contrary to the majority's assertions, *Cammon* cannot be distinguished from the present case.

By focusing on whether a claim is causally connected to medical care, the majority never considers the nature of plaintiff's complaint. In the case at bar, plaintiffs contend that the facts alleged in count III of the second amended complaint demonstrate that the negligence which led to Anna Marie's poisoning and, in turn, the alleged injuries sustained by Robert *in utero*, were based on Pierce's failure to fill containers correctly and, as such, did not arise from medical negligence associated with Dr. Mercola's care and treatment of Anna Marie. Plaintiffs contend, therefore, that the trial court erred when it

dismissed count III of their amended complaint because the facts, viewed in a light most favorable to them, show that the claim is not one for medical negligence but, rather, a claim of ordinary negligence. Accordingly, plaintiffs maintain that count III is not subject to the medical malpractice statute of repose but, rather, to the limitations period set forth in sections 13–202 and 13–211 of the Code (735 ILCS 5/13–202, 13–211 (West 2004)). Notably, the majority never addresses plaintiffs' assertion that their claim is one for ordinary negligence. As a result, the majority never considers whether the distinction between ordinary negligence and medical negligence has any significance when deciding whether an injury arises out of patient care within the meaning of the statute. I believe this to be error.

Recently, in *Heastie v. Roberts*, 226 Ill. 2d 515 (2007), this court drew a distinction between a medical negligence claim and an ordinary negligence claim where the allegedly negligent conduct occurred within a medical setting. In *Heastie*, the plaintiff was an emergency-room patient who had been restrained and moved to a secluded area because he had no apparent injury, but was drunk, disruptive and deemed a danger to himself and others. While plaintiff was restrained, a fire broke out in the area where plaintiff was being held. The origin of the fire could not be determined. However, there was some evidence that the ignition source might have been a lighter belonging to the plaintiff. Plaintiff brought a negligence action against the hospital and others, alleging, among other things, that defendants had been negligent because they failed to restrain him properly, failed to search him for contraband before restraining him, and failed to monitor him.

On appeal, the issue was whether expert medical testimony was necessary to establish the standard of care with regard to plaintiff's claim of negligence based on the hospital personnel's failure to search plaintiff for contraband prior to restraining him and placing him in seclusion. Finding that "[w]hether a hospital patient should be restrained involves the exercise of medical judgment" but "[w]hether the patient should be searched for potentially dangerous contraband before being restrained and sequestered does not" (*Heastie*, 226 Ill. 2d at 553), we held that "plaintiff's failure-to-search claim *** falls within the category of ordinary negligence" (*Heastie*, 226 Ill. 2d at

552) and, for that reason, expert testimony was not required. We noted, further:

> "Prerestraint contraband searches are wholly unrelated to the diagnosis or treatment of a patient's condition. They serve no medical function of any kind. Their purpose is purely safety related, specifically, to insure that a patient who is going to be restrained and then left alone will not have access to implements which may be used to effect an escape, inflict harm on himself or others, or destroy property. Such a purpose bears on a hospital's administrative and management functions, not its delivery of medical care." *Heastie*, 226 Ill. 2d at 553.

In *Heastie*, this court did not address the question of whether the medical malpractice statute of limitations and repose applied.[10] But had it done so, it is clear that, using the majority's "causal connection" test, the plaintiff's claim, which was found to be an ordinary negligence claim, would be subject to the medical malpractice statute of repose. The *administrative decision* not to search the patient for contraband was "related to," "incidental to," and occurred in the course of the plaintiff's medical care and treatment.

What this means, then, is that a claim that is determined by this court to be "wholly unrelated to the diagnosis or treatment of a patient's condition" (*Heastie*, 226 Ill. 2d at 553) would, nonetheless, be subject to the medical malpractice statute of repose based upon this court's "causal connection" test. This anomalous result illustrates the serious flaws in the majority's interpretation of the statute. It simply makes no sense that a claim can be found to be ordinary negligence for the purpose of deciding whether expert testimony is required, yet subject to the medical malpractice statute of repose because it is causally connected to the patient's treatment.

It is true that the term "medical malpractice" is not found in the language of section 13–212. But that fact is not determinative. The cardinal principle of statutory interpretation is to ascertain and give effect to the intent of the legislature. *J.S.A. v. M.H.*, 224 Ill. 2d 182,

---

[10]In *Heastie*, a motion to dismiss based on the statute of limitations was raised, but that issue was never reached by this court or the courts below.

196 (2007). We must presume that the legislature did not intend absurdity, inconvenience or injustice. *J.S.A.*, 224 Ill. 2d at 210. In my view, interpreting the medical malpractice statute of repose as the majority does leads to absurd and unjust results which were never intended by the legislature. Because the majority interprets the statute using a "but for" test that fails to take into account the distinction between ordinary negligence and medical negligence, leading to absurd results, I must reject it.

My conclusion that the statute of repose applies to claims involving medical negligence does not end the inquiry in this case. It must now be determined whether, under the facts alleged, the plaintiffs here are seeking recovery for medical negligence.

In the case at bar, it is undisputed that Anna Marie visited Dr. Mercola and became his patient. It is also undisputed that, after examining Anne Marie, Dr. Mercola diagnosed her condition and instituted a plan of treatment. Part of that treatment plan was the recommendation that Anna Marie take the dietary supplement L-glutamine. However, Dr. Mercola's recommendation of L-glutamine is not the basis for plaintiffs' claim for damages. Plaintiffs do not allege that L-glutamine, or any other part of Dr. Mercola's treatment plan, caused Anna Marie any harm.

Plaintiffs' alleged injuries resulted from Anna Marie's ingestion of selenium, which occurred because one of Dr. Mercola's nonmedical staffpersons, in conjunction with Dr. Mercola's sale of dietary supplements, improperly filled a container marked "L-glutamine" with selenium. Selenium was not the substance Dr. Mercola recommended to Anna Marie. The container of selenium that Anna Marie purchased was just one of several improperly filled containers which were sold in conjunction with Dr. Mercola's supplement business. It was not prepared specifically for Anna Marie as part of her treatment.

Based on these facts, I would conclude that the alleged wrongful act is not an act of medical negligence but, rather, ordinary negligence–the failure to use due care in performing the ministerial task of filling containers with a vitamin supplement. Unquestionably, had Anna Marie taken L-glutamine and suffered injury as a result, her claim would have been one seeking recovery for medical negligence and, as such, would have been subject to the statute of repose. But that is not what happened here.

This case is distinguishable from *Stiffler* because, here, the facts indicate that Dr. Mercola undertook an activity that was not part of his patient's medical treatment–he engaged in the sale of dietary supplements. The fact that his customers were almost exclusively his patients does not convert this business enterprise into patient care. Moreover, it was in the course of that business enterprise that Dr. Mercola, through his agent Pierce, placed containers of an improperly labeled substance into the stream of commerce. Anna Marie purchased one of those improperly labeled containers and, as a result, ingested selenium, a substance that was not recommended by Dr. Mercola and which allegedly caused plaintiffs' injuries. The improperly labeled supplement was not given to plaintiff as part of her treatment but, instead, was purchased by Anna Marie in the doctor's reception area, where it might have been purchased by anyone, patients and nonpatients alike. In fact, others did purchase similarly mislabeled containers. Based on these alleged facts, I would conclude that the basis of Dr. Mercola's liability was not his medical negligence in the care and treatment of his patient, Anna Marie but, instead, errors and omissions associated with his sale of supplements–an enterprise that was separate from his practice of medicine.

In sum, I would find that count III of plaintiff's amended complaint did not set forth a claim of medical negligence and, as a result, is not subject to the medical malpractice statute of repose found in section 13–212(b). In light of this determination, I would not consider plaintiff's alternative argument that the tolling provision contained in subsection (c) of section 13–212 is applicable in this case.


JUSTICE GARMAN, dissenting:

I agree with the majority that plaintiffs in this case alleged an injury arising out of patient care. Accordingly, I agree with the majority's discussion of the term "arising out of patient care" and its finding that plaintiffs' complaint is subject to the eight-year statute of repose period found in section 13–212(b) of the Code. I do not agree, however, with the majority's finding that because Robert (the child allegedly injured in this case) was a fetus at the time of the occurrence that led to his injury, the eight-year period of repose did not begin to run until he was born and had a right to pursue his claim in court. This finding leads the majority to conclude that Robert's claim was timely

filed and reverse the dismissal of count III of plaintiffs' amended complaint. For the reasons that follow, I believe that the plain language of section 13–212 makes Robert's claim untimely. As such, I would affirm the dismissal of count III of plaintiffs' amended complaint and must respectfully dissent.

The appellate court found that because Robert's cause of action accrued when he was born, and because he was not under a disability other than minority at that time, the statute of repose was not tolled. Slip op. at 21. According to the appellate court, the repose period ended eight years after the injury occurred. Slip op. at 21-22.[11] As a result, count III of plaintiffs' complaint was not timely filed. Slip op. at 21-22. The majority disagrees with this analysis, finding that the word "accrued," as used in section 13–212, is ambiguous.

Analyzing the term "accrued" for the purposes of sections 13–212(b) and (c), the majority finds that it means that facts exist that authorize the bringing of a cause of action or that the claim has come into being as an enforceable claim or right. Slip op. at 26. After noting that an injury to a fetus does not accrue until birth, the majority acknowledges that when a fetus is injured, the occurrence of the injury and the accrual of the cause of action take place at different times. Slip op. at 26. Nevertheless, the majority disagrees with the appellate court that this means that the statute of repose began to run when Robert's injury occurred, while he was *in utero*.

I believe that the plain language of this statute is unambiguous. As the majority acknowledges, this is a statute of repose and statutes of repose extinguish causes of action after a fixed period of time after a specified event occurs. Slip op. at 27. In this case, the repose period provided in section 13–212(b) is eight years. Robert's injury occurred over 8½ years before the count at issue here was filed. Unless the tolling provision provided by section 13–212(c) applies, Robert's cause of action cannot be maintained. Section 13–212(c) only applies, though, if it can be shown that Robert was under some sort of

_____

[11]It is not controverted that Robert's alleged injury occurred on May 25, 1995, when his mother ingested selenium while he was *in utero*. He was born on January 5, 1996. Count III of plaintiffs' amended complaint was filed on December 22, 2003.

disability other than minority when he was born, the time which even the majority acknowledges Robert's injury accrued. The majority never suggests, however, that Robert was under any disability other than age.

The majority asserts that it would be repugnant to basic notions of fundamental fairness to hold that the clock is ticking on someone's right to file suit during a period in which the law forbids that person from filing suit. Slip op. at 31-32. The majority relies on case law stating that "it has long been the public policy of this state that courts should carefully guard the rights of minors and that a minor should not be precluded from enforcing his or her rights unless clearly barred from doing so." *Bruso v. Alexian Brothers Hospital*, 178 Ill. 2d 445, 454-55 (1997). In light of this, the majority finds no clear bar to Robert's suit in section 13–212 and believes it farfetched that the legislature worded this statute in order to provide different time limits for children injured *in utero* and children injured after birth. Slip op. at 31.

The majority acknowledges, however, that this court has already spoken to the purpose behind the General Assembly's enactment of section 13–212. In *Hayes v. Mercy Hospital & Medical Center*, 136 Ill. 2d 450 (1990), this court found that the General Assembly limited the time period in which a party could bring a suit for medical malpractice in response to what it perceived as a medical malpractice insurance crisis. Section 13–212 created definite time periods in which causes of action could be filed in order to prevent extended exposure of physicians, increase the ability of insurance companies to predict liability, and assist in reducing health-care malpractice insurance premiums. *Hayes*, 136 Ill. 2d at 458. The legislature specifically enacted section 13–212 to respond to a perceived medical malpractice insurance crisis by preventing extended liability exposure, increasing predictability, and assisting in reducing health-care malpractice premiums.

While it is true that it is the public policy of this state that courts carefully guard the rights of minors, the plain language of this statute indicates an intent to supersede that policy in limited circumstances. I believe this is one such circumstance. The tolling provision here, section 13–212(c), provides that the repose period provided in section 13–212(b) can be tolled, but only for those persons who, "at the time

the cause of action accrued, [are] under a legal disability other than being under the age of 18 years." 735 ILCS 5/13–212(c) (West 2006). At the time of Robert's birth–when his cause of action accrued–he was not under a legal disability other than age. The statutory language is clear that the tolling takes place only where a potential claimant is under a legal disability other than being under the age of 18 years. Because no such showing is made, the statue of repose is not tolled.

By invoking the public policy that courts need carefully guard the rights of minors, the majority renders meaningless the provision that section 13–212(b) be tolled for those under legal disabilities other than being under the age of 18 years. This is improper considering that it is a cardinal rule of statutory construction that a statute should be construed, wherever possible, such that no word, clause, or sentence is rendered meaningless or superfluous. *Sylvester v. Industrial Comm'n*, 197 Ill. 2d 225, 232 (2001). The majority's interpretation does just that, though, rendering mere surplusage the language "other than being under the age of 18 years." See *Arnold v. Board of Trustees of the County Employees' Annuity & Benefit Fund*, 84 Ill. 2d 57, 62 (1981) (where this court indicated a strong presumption against finding statutory language to be mere surplusage). It cannot be that the legislature intended the rights of minors to supersede other policy goals in a statutory provision which specifically excludes them. The plain and unambiguous language of the statute provides that for the repose period to be tolled it must be shown that Robert was under a legal disability other than being under the age of 18 years at his birth. Interpreting the statute in this way adheres to the rules of statutory construction and properly gives the clause "other than being under the age of 18 years" meaning in this case.

It is my opinion, then, that the plain language of this statute clearly bars Robert's suit. While this view may seem harsh, it is supported by the plain language of the statute and consistent with the purpose behind the statute's enactment. See, *e.g.*, *Anderson v. Wagner*, 79 Ill. 2d 295, 312 (1979) (holding that while statutes which bar causes of action before they are even discovered may seem harsh, "the reasonableness of the statute must be judged in light of the circumstances confronting the legislature and the end which it sought to accomplish"). When the plain language of a statute is clear, it is for the legislature, not the courts, to remedy any perceived shortcomings.

See *Ultsch v. Illinois Municipal Retirement Fund*, No. 102232, at 10 (August 7, 2007) ("There is no rule of statutory construction that authorizes a court to declare that the legislature did not mean what the plain language of the statute says"); *Big Sky Excavating, Inc. v. Illinois Bell Telephone Co.*, 217 Ill. 2d 221, 240 (2005) ("Whether a statute is wise or whether it is the best means to achieve the desired result are matters left to the legislature, not the courts"); *Bridgestone/Firestone, Inc. v. Aldridge*, 179 Ill. 2d 141, 156-57 (1997).

I think it is important to note that this is not a situation where children injured *in utero* are barred from bringing suit simply by virtue of that fact. Nor even is this a situation where the time period within which such children can bring suit is severely curtailed. At the very least, a child injured *in utero* will still have seven years and three months to bring suit after birth. Indeed, in this case, while Robert could not have brought suit while *in utero*, he still had over seven years within which to bring suit after his birth.